19402

Darlene L. POWELL, Administratrix C. T. A. of the Estate of Johnnie M. Powell, Respondent, v. Joseph W. SIMONS, Appellant.

(188 S. E. (2d) 886)

*Joseph R. Young, Esq.,* of *Young, Clement & Rivers,* Charleston, *for the Appellant,*

*Messrs. George B. Bishop,* of *Dennis, Dennis & Bishop,* Moncks Corner, and *Wright Dixon, Jr.,* of *Bailey, Dixon &*

*Wooten,* Raleigh, N. C., and *Hammer & Bernstein* of Columbia, *for Respondent,*

April 20, 1972.

Moss, Chief Justice:

This action was instituted by Darlene L. Powell, as administratrix *cum testamento annexo* of the estate of Johnnie M. Powell, deceased, the respondent herein, against Joseph W. Simons, the appellant herein, to recover damages for the wrongful death of the said Johnnie M. Powell. This action was brought pursuant to Section 10-1951, *et seq.,* of the Code, for the benefit of the widow and the surviving children.

The respondent's testate was riding as a guest passenger in an automobile owned and operated by the appellant. It is alleged in the complaint that on November 9, 1967, the appellant was operating his automobile in an easterly direction over and along highway 31 and that at the junction of said highway with highway 45 he collided with an automobile operated by one Dewey B. Stewart, resulting in severe injuries to Johnnie M. Powell, from which he later died. It is also alleged that the respondent's testate's death was due to and proximately caused by several acts of carelessness, negligence, willfulness, wantonness and recklessness of the appellant, *inter alia,* (a) driving his automobile at a high, dangerous and excessive rate of speed; (b) in failing to keep a proper lookout for other vehicles using said highway; (c) in operating his automobile with defective and insufficient brakes and in failing to apply same; (d) operating his said automobile over a public highway and failing to stop at an intersection in violation of a stop sign; and (e) failing to decrease the speed of his vehicle when he approached the intersection of two highways and in failing

to yield the right of way to a motor vehicle using the intersecting highway.

The appellant, by answer, denied that he operated his automobile in a reckless, willful and wanton manner and plead the guest statute as a further defense.

This case came on for trial before the Honorable Frank Eppes, presiding judge, and a jury, at the 1970 September Term of the Court of Common Pleas for Berkeley County and resulted in a verdict in favor of the respondent for actual damages.

The appellant, at appropriate stages of the trial, moved for a nonsuit and a directed verdict, and after the verdict, for judgment *non obstante veredicto,* upon the ground that there was no evidence of actionable recklessness and wilfullness on his part. The trial judge refused the aforesaid motions and this appeal followed.

In considering whether the trial judge erred in refusing the several motions of the appellant, the evidence and the reasonable inferences to be drawn therefrom must be viewed in a light most favorable to the respondent. If more than one reasonable inference can be drawn from the evidence, the case must be submitted to the jury. However, if the evidence is susceptible of only one reasonable inference, the question is no longer one for the jury but one of law for the Court. *Gause v. Livingston,* 251 S. C. 8, 159 S. E. (2d) 604.

It being admitted that Johnnie M. Powell was riding as a guest passenger in the automobile of the appellant, the action is governed by Section 46-801 of the Code, which provides:

"no person transported by an owner or operator of a motor vehicle as his guest without payment for such transportation shall have a cause of action for damages against such motor vehicle or its owner or operator for injury, death or loss in case of an accident unless such accident shall have

been intentional on the part of such owner or operator or caused by his heedlessness or his reckless disregard of the rights of others."

Under the foregoing statute, a guest cannot recover against the operator for simple negligence. The statute restricts liability to cases where the injury has resulted from either intentional or reckless misconduct of the operator of a motor vehicle. The only duty that the operator of a motor vehicle owes to a guest passenger is not to injure him willfully or by conduct in reckless disregard of his rights. *Elrod v. All,* 243 S. C. 425, 134 S. E. (2d) 410. The burden was upon the respondent to establish that her testate's death was the result of willful or reckless misconduct on the part of the appellant in the operation of his automobile. *Ray v. Simon,* 245 S. C. 346, 140 S. E. (2d) 575.

Our inquiry here is whether the respondent presented any evidence that shows the appellant guilty of either intentional or reckless misconduct in the operation of his automobile which proximately caused the death of Johnnie M. Powell. The test by which a tort is to be characterized as reckless, willful or wanton is whether it has been committed in such a manner and under such circumstances that a person of ordinary reason or prudence would have been conscious of it as an invasion of the rights of the deceased. *Suber v. Smith,* 243 S. C. 458, 134 S. E. (2d) 404.

The record shows the junction of South Carolina highways 31 and 45, in Berkeley County, was in the form of a Y with both highways running in the same roadbed east of the junction and branching out to the west. Highway 31, in its intersection with highway 45, runs almost straight into said highway and highway 45 at the intersection veers to the left in a southwesterly direction. The area forming the junction and intersection made a right triangle in shape; the base being formed by a cross-over for traffic on highway 31 to proceed west on highway 45, the altitude, 140 feet more

or less, being a continuation of highway 31 beyond the cross-over and the hypotenuse being bounded by highway 45 as it turned to the southwest. Highway 45 was the dominant road and highway 31 was the servient road.

Normally, on highway 31 there is a "Stop Ahead" sign at approximately 684 to 750 feet west of the junction, a "Junction" sign with arrows showing the direction of travel on highway 45 was located approximately 360 feet west of the intersection and a "Stop" sign approximately 33 feet west of the junction. There was a yellow line dividing the lanes of travel on highway 31 west of and going into the intersection. There were double yellow lines in the center of highway 45 at the intersection.

It is agreed that on Halloween night, prior to November 9, 1967, unidentified vandals took down the "Stop" sign on highway 31 at its intersection with highway 45 and moved the "Stop Ahead" sign from its location on highway 31 and placed the said sign in the hole where, normally, the "Stop" sign would have been located. The "Stop" sign was later found in the ditch alongside highway 31.

The record shows that Johnnie M. Powell and the appellant, both of whom were residents of Wake County, North Carolina, were in Berkeley County for two days for the purpose of fishing in the Santee-Cooper Lake. They had stayed at a fish camp located on highway 31, 1.1 miles west of the junction of the aforesaid highway with highway 45. These two men left the fish camp after dark on November 9, 1967, for the purpose of returning to their home, and headed east on highway 31. The appellant was driving the automobile and Powell was a guest passenger therein.

Sergeant Thompson, a member of the State Highway Patrol, was one of the investigating officers. He stated that he talked to the appellant at the scene of the collision and he said that "he and Mr. Powell had been fishing up at I believe Wilson's Landing and that they were headed back to North Carolina and he said that he was coming east on

Secondary 31 and he saw the stop ahead sign and when he saw the stop ahead sign he let off on the accelerator and the next thing he knew there was a wreck."

D. R. Benson, another Highway Patrolman, testified that he went to the scene of the collision and made certain measurements. He said that from the stop ahead sign, which was 30 feet west of the intersection, to the beginning of the skid marks was 161 feet. He said there were 75 feet of skid marks laid down by the appellant's car. He testified that the usual distance between a stop ahead sign and a stop sign was 700 to 800 feet and that the purpose of a stop ahead sign is to warn motorists that they are approaching a stop sign. He also testified that the speed limit was 55 miles per hour on both roads.

The respondent called as a witness W. B. Bazzle, the resident maintenance engineer of the South Carolina Highway Department. He testified that the purpose of placing a stop ahead sign on a highway was to warn motorists of a dangerous intersection or railroad crossing and that he must come to a stop. He said that when a motorist sees a stop ahead sign he knows that there is a stop sign ahead of him at which he is to stop. He further testified that on this particular highway, according to the highway manual, a stop ahead sign would be around 750 feet from the stop sign.

It appears from the testimony of one Tom Chandler, a witness for the respondent, that he accompanied Powell and the appellant, on a previous occasion, to the Santee-Cooper Lake. At such time, they were in an automobile belonging to and driven by the deceased. They traversed the intersection of highways 45 and 31 going into and leaving from the Lake.

The appellant testified that he had been to the Santee-Cooper Lake only one other time prior to the occasion in question. He said he had no recollection of ever coming to the Lake with the witness Chandler. On his previous visit he and the decedent came by way of Eutawville and did

not come through the intersection of the highway in question. He said that on the day of the collision that he and the decedent left the fish camp after dark on the night of November 9, 1967, traveling east on highway 31, at a speed of between 45 and 50 miles per hour. He testified that as he was driving along highway 31, he saw a sign reading "Junction, S. C. 45" with an angle or curve in it showing the direction in which it went. He said that the next sign that he saw was "Stop Ahead" and when he reached this sign he took his foot off the gas and was slowing up anticipating a "Stop" sign and at that instant lights began to turn into his lane. He said he thought someone was coming into his lane. He testified that as he was applying his brakes the decedent said to him "watch it, Stud". He further testified that when he saw the "Stop Ahead" sign he thought he had a normal distance before he would reach the "Stop" sign. The appellant admitted that when he applied his brakes his car started skidding. He stated he knew he was approaching a "Junction", but had no way of knowing he would be required to stop until he saw the "Stop Ahead" sign.

There is no evidence from which it can be concluded that the appellant knew highway 45 was the dominant one and highway 31 the servient one.

In *Eberhardt v. Forrester,* 241 S. C. 399, 128 S. E. (2d) 687, this Court had occasion to consider the effect of the temporary absence of a stop sign protecting the intersection to a dominant highway. In the cited case we announced the following general principles:

"1. Once a through street or arterial highway has been properly designated and appropriate signs have been erected, the preferred status of the highway is not lost merely because a stop sign is misplaced, improperly removed, destroyed or obliterated.

"2. A motorist on a preferred highway is entitled to assume that a vehicle approaching on a secondary highway

will stop for the intersection, unless he has knowledge of the absence of the sign, or he is otherwise put on notice that the vehicle on the intersecting street is not going to stop.

"3. A motorist on a secondary highway is required to stop if he has knowledge of the nature of the preferred highway, even though the sign is absent.

"4. A motorist on a secondary highway is not required to stop in the temporary absence of a stop sign, if he does not have knowledge of the character of the preferred highway, but may still be liable if he is otherwise negligent."

The case of *Gilliland v. Ruke,* 4 Cir., 280 F. (2d) 544, was a wrongful death action arising out of an intersectional collision between an automobile driven by the decedent and a tractor-trailer owned and operated by the defendants. One of the problems which faced the trial court in deciding how to instruct the jury arose from the fact that the stop sign which normally would have confronted the driver of the tractor-trailer as he approached the intersection from the south was not in place at the time of the accident. It appears that the highway on which the driver was traveling was a servient one and he was required by law to stop before entering the intersection. Prior to the time of the collision, the Highway Commission of North Carolina had erected stop signs on the servient highway, the purpose being to designate the main traveled highway as the dominant one. There was also erected on the servient highway 600 feet south of the intersection a sign reading "Stop Ahead", 500 feet south of the intersection a sign indicating a crossroads intersection, 300 feet from the intersection a sign indicating a "Junction" and 140 feet a sign indicating destinations east and west on the dominant highway. All of these signs were standing and visible to motorists except the "Stop" sign facing motorists approaching on the servient highway from the south, such having been knocked down about four hours prior to the collision and hence not visible to motorists on the servient highway approaching the intersection. The

driver of the tractor-trailer truck was not aware that he was approaching a through highway but, as he approached the intersection, he passed all of the foregoing signs except the stop sign which was not then in place.

The Court held that under the aforementioned circumstances that Shahan, the driver of the tractor-trailer truck, had no statutory duty to stop at the intersection. The Court further stated that the designation of the dominant highway was effectuated only by the posting of stop signs. The Court further held that the duty to stop does not derive from the fact that a stop sign may have been erected by the proper authorities at some time in the past. Rather, it depends upon the presence of such a sign at the time that the driver approaches the intersection. He is commanded to stop in obedience to the stop sign. If no such sign is in sight and the driver is not aware that there should be one, there is nothing to obey and hence no statutory duty to stop.

We quote the following from the cited case:

"Appellant draws attention to the fact that although the stop sign was missing, Shahan was confronted with a whole row of other signs south of the intersection, as described earlier in this opinion.

"The only one of these other signs which provided any notice that a stop would be required was the sign six hundred feet south of the intersection reading 'Stop Ahead.' This was a cautionary sign which warned drivers to prepare to stop. It was not, however, the kind of a sign described in section 20-158(a) to which approaching drivers are required to render obedience by coming to a stop. The stop signs referred to in that statute are signs erected 'at the entrance' to the main traveled or through highway. A sign six hundred feet away from an intersection cannot reasonably be said to be at the 'entrance' thereto."

In *Seyfer v. Gateway Baking Company*, D. C., 159 F. Supp. 167, applying Arkansas law, it was held that where a stop sign has been removed, the existence of a "Stop Ahead"

sign confronting the motorist on approaching the intersection, does not require him to stop at the intersection. In *Mikle v. Blackmon,* 252 S. C. 202, 166 S. E. (2d) 173, we recognized that motorists, from almost universal usage, have learned to rely upon the presence of traffic control signs or signals at all save, perhaps, the least traveled intersections. A stop sign requires a motorist to bring his vehicle to a complete stop, or, as is said in Section 46-267, of the Code, it means "complete cessation from movement." A "Stop Ahead" sign is not defined in our statutes but it means that a motorist must reduce his speed and be prepared to stop at the "Stop" sign.

Here, the appellant, when he reached the "Stop Ahead" sign, would have had 700 to 800 feet before reaching a "Stop" sign but because of the criminal acts of vandals, the "Stop Ahead" sign was only approximately 30 feet from the intersection. The appellant was unfamiliar with the intersection of the highway in question and was misled by the acts of the vandals, who had removed the "Stop" sign and placed the "Stop Ahead" sign in the position where the stop sign would ordinarily have been. When the appellant reached the "Stop Ahead" sign he took his foot off of the gas and began looking for the "Stop" sign which would be located further down the road.

After reviewing all of the evidence in this record, we conclude that the only reasonable inference to be drawn therefrom is that the appellant operated his automobile with due care under the circumstances and was not guilty of intentional, willful, or reckless misconduct in the operation thereof. Hence, there is no liability of the appellant to the respondent under the guest statute, Section 46-801 of the Code.

The exceptions which assign error in refusing the motions of the appellant for a directed verdict and judgment *non obstante veredicto* are sustained and this case re-

manded to the lower court for entry of judgment in favor of the appellant.

Reversed.

LEWIS, BUSSEY, BRAILSFORD and LITTLEJOHN, JJ., concur.