YAZOO & M. V. R. Co. v. LAMENSDORF et al.

(Division B. Nov. 29, 1937.)

[177 So. 50. No. 32808.]

Shands, Elmore, Hallam & Causey, of Cleveland,
Burch, Minor & McKay, of Memphis, Tenn., and Edw.
C. Craig, of Chicago, Ill., for appellant.

Marx J. Borod, of Memphis, Tenn., for appellees.

434

Maynard, Fitzgerald & Venable, of Clarksdale, for appellees.

**Maynard, Fitzgerald & Venable**, of Clarksdale, for appellees on Suggestion of Error.

440

Argued orally by **H. D. Minor** and **Hugh F. Causey**, for appellant, and by **W. W. Venable**, for appellee.

**Ethridge, P. J.,** delivered the opinion of the court.

Appellees, Mrs. Jennie E. Lamensdorf and her son, R. G. Lamensdorf, filed suit against appellant, the Yazoo & Mississippi Valley Railroad Company, for the death of M. Lamensdorf, husband and father of appellees, which occurred at a railroad crossing where the track crosses highway 61 at Choctaw about two miles of Shaw, Miss.

The declaration charged that appellant negligently failed to keep the crossing in question and the approach thereto in such a condition as to afford a safe and convenient means of travel over same; that appellant negligently permitted houses and trees to remain near the

crossing; and failed to sound its whistle or ring its bell in the manner required by statute after observing the peril of the deceased.

The appellant pleaded the general issue, and that the crossing in question was and is a public grade crossing, a part of a public road which traverses it at a right angle; that the statutory Mississippi stop sign was being maintained on the right side of the public road, in plain view of persons traveling thereon; and that the deceased, M. Lamensdorf, on that occasion, drove on said crossing without stopping, looking, and listening, as required by section 6124, Code 1930, and stopped his car on the crossing without alighting therefrom after becoming aware of the approaching train; and that the negligence in so doing caused his death. The highway number 61 crosses the railroad line at right angles, after running parallel thereto for some distance. North of this crossing 408 feet is a railroad trestle 243 feet long, and east of this trestle is a bridge on the highway; 1,290 feet north of the crossing is what is known as the whistling post, which is the point where engineers approaching from the north are required to sound their whistles and ring their bells. On each side of the track there are telephone poles used by the telephone and telegraph companies, which poles are about 165 feet apart. On the east side of the track is a pole a few feet north of the crossing, and on the west side the first pole is about 150 feet north of the crossing. On the west side of the tracks are residences for the section foreman and other workers for the railroad company, and in front of these houses are five trees located 39 feet from the center of the railroad tracks, and the houses and trees are fenced in and maintained by the railroad company. On the east side, 118 feet from the track, is a store operated by a Chinaman. The railroad is practically straight for two miles north of the crossing, and one looking north can see for more than a mile. The accident occurred on August 20, 1936, at about 11 a. m.,

on a fair day. M. Lamensdorf, the decedent, owned and operated a farm south of this crossing near the village of Choctaw, and on the day of the accident he was traveling north on highway 61, in a Chevrolet sedan, going about 20 miles per hour, and passed two of the witnesses, Mr. and Mrs. Wayne Brock, who had stopped their car about 450 feet south of the crossing. M. Lamensdorf did not stop at the stop sign, or at any point on the highway before reaching the crossing, but continued onto the crossing, and there remained until the locomotive hit the rear of his automobile and damaged the left side of the trunk which was fastened on the rear of his car. The car was turned around, its rear end of the left fender was broken, but none of the glass was broken, and the spare tire on the rear of the car was not damaged.

There are many errors assigned, several of which would call for a reversal; such as permitting the jury to view the scene of the accident after the situation which existed at the time of the accident had been changed, and which view, owing to the changed condition, was unnecessary. As we have previously held, where the view could have been disclosed by photographs, diagrams, and measurements, a view should not be permitted; and because of instructions authorizing the assessment of punitive damages, and because the verdict was contrary to the overwhelming weight of the evidence. The most serious question, however, is whether or not the peremptory instruction requested by the appellant, and refused, should have been granted.

We have given this question great study, and the judges have considered all the evidence in the record, and we have reached the conclusion that the peremptory instruction should have been granted, and, consequently, it is not necessary to discuss any other question.

The case for plaintiff as to liability rests largely upon the testimony of Mr. and Mrs. Brock, who were near the crossing and observed M. Lamensdorf approach the

crossing until he was struck and killed. There were many photographs and measurements of the physical condition of the crossing and its approaches. Brock had stopped his automobile to make an adjustment about it when Lamensdorf passed by going twenty miles per hour. Brock was traveling in a model T. Ford truck with his wife, and some distance north he observed M. Lamensdorf drive upon the track and stop, and Brock said he heard the train approaching. He estimated that Lamensdorf was on the crossing about 45 seconds, and that witness heard the train approaching, and saw deceased was trying to shift his gear. Brock stated that the deceased remained on the crossing manipulating his gear and working around his automobile for about three-fourths of a minute before the train hit the car, and that he (Brock) stated to his wife, "Right yonder is a man going to get killed, if he don't mind," and he further testified that he did not hear the train whistle until about fifteen seconds before it hit the automobile, but that he heard the train coming, and that the bell was continually ringing. Mrs. Brock testified that her husband had stopped their truck 140 or 150 yards south of the crossing, and that the deceased drove past them and up on the crossing; that she heard the engine whistle when the engine was on the trestle, which was about 408 feet north of the crossing. She had heard the train coming before the deceased passed them, and heard the whistle blow and the bell ringing before she saw the train, and she said the whistle continued to blow and the bell continued to ring until after the locomotive hit the automobile. She further testified that the train was not running fast when it hit the automobile, and that she saw the deceased manipulating his gear right up until the collision.

Another witness, Fred Mahoney, a plumber, testified that he left Shaw going south on highway 61, which parallels the railroad tracks on the east, and just as the train stopped on account of this accident, he caught

up with its rear; that he did not hear the whistle blow or the bell ring as he was not paying any attention to such signals, not having such matters on his mind, and could not state whether such signals were given or not.

Miss Snodie Howard, a school teacher, was also traveling south on highway 61, but she was not paying any attention to the train, but was watching the road. She said as she approached the north end of the road bridge east of the railroad trestle she heard the locomotive give "a long, shrill whistle;" that she looked up and saw the locomotive standing on the crossing, but she turned her eyes away from the crossing to avoid seeing the accident.

There was other evidence offered as to the habits and business ability of the decedent, his earning capacity, and life expectancy.

The appellant introduced its engineer who testified that he began to blow the whistle at the whistling post 1,290 feet north of the crossing, and, at the same time, turned on the apparatus which rang the bell automatically, and that the whistle continued to blow and the bell to ring until the engine passed over the crossing; that he first saw the deceased some twelve or fourteen feet, and he was proceeding to cross the track at the rate of ten or twelve miles per hour, in his judgment, and that the deceased passed out of his view because the engine obstructed his view near the crossing, and that the fireman told him to, in substance, shoot the works, meaning to put on the emergency, which was done, and the whistle was blown and the bell rung.

Pat Mulvahill, the brakeman, testified that the engineer began to blow the whistle and ring the bell at or about the whistling post, and that the whistle continued to blow and the bell to ring until after the car was struck.

Another witness, J. P. Ingram, a cotton gin operator, testified that he was returning from Shaw to his home on the day of the accident, and he heard the whistle

blow and thought the engineer was trying to prevent him from trying to cross before the train. He did not notice the bell ringing, but could not say that it was not ringing.

Ethel Ryan, daughter of the section foreman, was at home in the north room of the section foreman's residence, and heard the train blow about 308 feet north of the trestle, but did not notice the ringing of the bell.

Mrs. J. L. Ryan, wife of the section foreman, was at home on the day of the accident and heard the whistle blow north of the crossing.

J. L. Ryan, section foreman, was working on the railroad track; heard the train blow, but was too far from the train to hear the bell ringing.

Will Singleton, a negro, was traveling north in a mule drawn wagon hauling seed cotton to be ginned at Shaw. He heard the whistle blow and it scared his mules, and he grabbed his little boy who was with him and the lines, and he said he saw a car on the crossing, but thought the engineer was trying to frighten his mules.

Mrs. C. P. Cole testified that she had stopped at the Italian's store to buy a Coca-Cola and heard the whistle, but paid no attention to the ringing of the bell, and could not say whether or not it did ring.

It was shown by witnesses that the highway crossing was in good condition; that the gravel was level with the track; and that the approach to the crossing is constructed on about a 9 per cent. grade, and is reasonably safe; that the approach to the crossing on the west side is banked, that is, the center of the road along the outside of the curve is elevated about one and one-half feet higher than the inside of the curve, which is the approved method for constructing curves in highways.

George Webb, a patrolman for the State Highway Department, testified as to the condition of the crossing, as did J. C. Davis, superintendent of the State Highway Department, who had jurisdiction of this and several other crossings, and there is no proof that the cross-

ing was not in a safe condition. It was clear that the appellant was not negligent in maintaining its crossing. A Mississippi stop sign had been duly erected in the proper places, and a person could see the third telephone pole north of the crossing on the east side of the track a distance of approximately 500 feet, and the fifth telephone pole on the west side of the track a distance of approximately 825 feet north of the crossing on the west side of the track. It was shown that when a person is 43 feet west of the crossing in the highway, he can see beyond the trestle, and when standing 29 feet west of the crossing, he can see two water tanks in Shaw and count 19 telephone poles, or a distance of approximately a mile. At a point 27 feet west of the crossing a person, it is alleged, can see a locomotive north of the whistling post and hear its whistle, and, when the jury and court were at the crossing, making observations, late in the afternoon, they could count at least ten telephone poles. After the sun went down, some of the witnesses moved up to a point ten feet west of the crossing, and could see a locomotive more than a mile north of the crossing. There was testimony showing that the trees in front of the section foreman's house had been trimmed after the accident and before the jury went to the scene thereof. The view by the jury being unauthorized, the verdict cannot be aided thereby.

It will be observed from the statement of the facts that the train was approaching from the north at the time Lamensdorf drove upon the track.

The evidence of persons who testified affirmatively shows that the whistle was blown and the bell rung continuously before reaching the crossing, and this is corroborated by other witnesses.

The estimate of the witness Brock was that there was, approximately, 45 seconds from the time Lamensdorf stopped on the crossing until he was struck by the engine; that he (Brock) saw the train about the trestle, which was 408 feet north of the crossing. This trestle

is shown by other evidence to be 243 feet. Mrs. Brock estimated the time to be about 3 seconds.

All the testimony shows that the train, on the occasion in question, was going from 35 to 40 miles per hour, and that when the emergency air brake was put on, the train began to slow down, or "buckle" as some witnesses expressed it. It was shown that after the train stopped the thirteenth car behind the engine stopped at the crossing, and that the average car is 36 feet long, making about 468 feet to be the length of the space the train had gone below the crossing. The train was traveling at the rate of about 52 feet per second. Taking the distance as agreed to by all the witnesses, when M. Lamensdorf was seen to stop upon the track, and placing the engine at the north end of the trestle, there would be about ten seconds by actual measurement.

The testimony of witnesses is to be taken, if reasonably possible, and considered on the theory that all are honest and trying to tell the truth, and under this theory, it is manifest that after M. Lamensdorf's position of peril was seen, it would have been impossible to have stopped the train to avoid the accident. Ordinarily, persons charged with duty, if they testify, are trying to tell the truth, and are more to be depended on than those persons who are not charged with any duty in reference to the matter. As against this assumption, we are met with the counter fact that ordinarily a man seeks to justify his own act, or to deny negligence; but where such witnesses are supported by corroborating affirmative testimony of other disinterested witnesses, and the only testimony in opposition is negative testimony of persons who did not hear the whistle or the bell, their attention being elsewhere, such negative testimony is insufficient to overturn affirmative testimony.

It is also a fact that vision is a more dependable fact than hearing when applied to a situation as exists in the case at bar. This is discussed in Moore on Facts, sections 712, 733, and 938.

We are mindful of the principle that where there is conflict in the evidence this matter is for the jury, and we also have in mind in considering this case the principles announced in the case of Davis, Director General of Railroads, v. Temple, 129 Miss. 6, 91 So. 689, and we are always reluctant to hold that a jury verdict is not supported by the evidence, especially when approved by a trial judge. We are also mindful of our duty to review this testimony and scrutinize with care all cases wherein verdicts are rendered upon unsatisfactory evidence; but the duty is upon us to determine judicially, from all the facts and circumstances in this case, whether the jury had sufficient evidence before them to uphold their verdict.

After a careful consideration of the facts of this case, we are of the opinion that the evidence was not sufficient to support the verdict, and, consequently, the peremptory instruction requested by the appellant should have been granted, and the judgment of the court below will, therefore, be reversed, and judgment rendered here for the appellant.

Reversed and judgment for the appellant.

**Griffith, J.,** delivered the opinion of the court on suggestion of error.

The case for appellees is built upon, and must stand, if at all, upon the testimony of the witness Brock that the deceased was stalled upon the railroad track, or partly thereon, for a period of 45 seconds, within which time appellant could easily have stopped its train before reaching the crossing. That estimate by Brock cannot be reconciled with the surrounding facts as shown by all the other witnesses; and weighing it in the scales of all ordinary human experience and observation, as it is our duty to do, it must be pronounced as incredible as a reasonable probability. It is possible, as almost anything is possible, that the length of time

did intervene as Brock estimates, but we repeat that as a probability it is incredible; and we suppose it is not now necessary to more than briefly refer to what we have so often heretofore said, to-wit, that to present a possibility, rather than a believable probability, is not a sufficient basis for a verdict and judgment. Berryhill v. Nichols, 171 Miss. 769, 773, 158 So. 470; Columbus & G. R. Co. v. Coleman, 172 Miss. 514, 522, 160 So. 277; New Orleans, etc., R. Co. v. Holsomback, 168 Miss. 493, 495, 151 So. 720; Williams v. Lumpkin, 169 Miss. 146, 153, 152 So. 842.

The scintilla of evidence rule has been discarded in nearly all jurisdictions, and is not recognized in this state; but verdicts must be based upon substantial evidence and that evidence must be reasonably believable. Whatever a jury here or there might chance to believe, we must require that the evidence upon which they act must be within state-wide legal standards, and one of these, as said, is that the evidence must be substantial and must be reasonably believable. Common experience and observation among all sensible men, who are impartial and without interest upon the issue, can lead to but one reasonable or substantial conclusion in respect to estimates of short periods of time, especially when that estimate, formed in a period of excitement, is in terms of seconds. So it is that all must agree with what the law books say on that subject: "Estimates of the duration of short periods of time into which such experience is crowded are notoriously inexact and are apt to be excessive, especially if the mind was in a state of anxiety or expectation, and a witness who assumes to measure time with accuracy under such circumstances discredits himself." 23 C. J., p. 37, and cases there cited. See, also, 2 Moore on Facts, p. 992, et seq. In this case, for instance, Brock estimated the time of the train from the bridge to the crossing at 15 seconds, while his wife said it was 3 seconds, and neither of them had it right.

If we were to accept the estimate of 45 seconds by

Brock as the duration of time that deceased was stalled on the track and discard all the other evidence, and allow this single estimate as sufficient in dependable substance to support a verdict, it would be to say that we will accept as substantially and controllingly dependable that which is declared by the authorities to be notoriously inexact and unreliable, and, moreover, would convict this train crew as bent upon homicide, and the deceased upon suicide, or at least that he was wholly indifferent to the most compelling motive or instinct which, under all circumstances and in every eventuality, incites men to action in their own behalf, namely, the instinct of self-preservation. Is it reasonably credible or believable that for 45 seconds the deceased would have sat in his stalled car, stalled on the railroad track, with an oncoming train in full view, with its whistle sounding alarm and its bell ringing, and with every other person aware of its approach, that he simply remained there until killed, when within much less time than 45 seconds he could have stepped out of his car to a place of safety only a few feet away? Appellees attempt to answer this question by saying that the deceased was frozen to his seat by fright, but in this they take resort to nothing but conjecture, there not being a word of fact in the evidence which would give probative support to any such contention.

The verdict is not supported by substantially dependable evidence, and we adhere to our original ruling so holding.

Suggestion of error overruled.