# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-CT-00634-SCT

*GREYHOUND LINES, INC.*

*v.*

*GERALD SUTTON, ADMINISTRATOR OF THE ESTATE OF NICHOLAS MAY, DECEASED; GERALD SUTTON, ADMINISTRATOR OF THE ESTATE OF SUMONE MAY, DECEASED; DONNIE CAUGHMAN, ADMINISTRATOR OF THE ESTATE OF MARCUS MAY, DECEASED; ESTATE OF CHERYL MAY; NANCY BONANNO; PAUL COTTER; AND ROBERT RILEY*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 04/18/1997 |
| TRIAL JUDGE: | HON. J. LARRY BUFFINGTON |
| COURT FROM WHICH APPEALED: | SIMPSON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | LUTHER T. MUNFORD |
| | REGINALD ARTHUR GRAY III |
| | REBECCA HAWKINS |
| | CHRISTOPHER R. GREEN |
| ATTORNEYS FOR APPELLEES: | KEITH M. ALEXANDER |
| | F. DOUGLAS MONTAGUE, III |
| | CRYMES G. PITTMAN |
| | DAVID SHOEMAKE |
| | C. VICTOR WELSH, III |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART- 08/24/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/15/2000 |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. This matter is a wrongful death action which arises out of a collision between an automobile driven by Cheryl May and a Greyhound bus. May and her three children were killed in the collision. The administrators of the respective estates of the children (the Administrators) filed suit against Greyhound Lines, Inc. and the estate of Cheryl May. Greyhound and May's estate then filed cross-claims against one another for the property damage to the bus and for the wrongful death of May, respectively. Three of the passengers in the bus eventually joined in the suit. The matter was tried in Simpson County Chancery Court,

and the chancellor found May 90 percent at fault and Greyhound 10 percent at fault. A judgment was entered in the amount of $1.1 million for each of May's children. A judgment for the passengers was entered in the amount of $680,000 for Nancy Bonanno, $285,000 for Paul Cotter, and $50,000 for Robert Riley.

¶2. The Court of Appeals affirmed the awards of the passengers, but it reversed and remanded the damages awards of the children, finding, inter alia, that the future incomes of the deceased children should be based on "some type of average income for persons in the community. . . ." ***Greyhound Lines, Inc. v. Sutton***, No. 97-CA-00634-COA, slip op. ¶ 33 (Miss. Ct. App. 1999). Greyhound and the Administrators filed petitions for the writs of certiorari which we granted. We affirmed the decision of the Court of Appeals as to the liability of Greyhound, but we reverse its decision regarding the damage awards for the deaths of the children and reinstate the chancellor's damage awards.

## FACTS

¶3. On the night of January 22, 1995, Cheryl May and her three children, Marcus, eight, Sumone, three, and Nicholas, one, were diving on Old Hebron Road in Jefferson Davis County. May ran a stop sign and collided with a greyhound bus traveling north on State Highway 13. May and her three children were killed instantly, and the driver of the bus, as well as some of the passengers, were injured.

¶4. A civil action was subsequently filed against Greyhound and May's estate by Gerald Sutton, the father and statutory beneficiary of Nicholas and Sumone, as well as the Administrator of their estates, and Donnie Caughman, Administrator of the estate of Marcus. Greyhound then filed a cross-claim against May's estate for property damage to its bus, and May's estate in turn filed a cross-claim against Greyhound for the wrongful death of May. Three of the passengers on the bus at the time of the collision, Nancy Bonanno, Paul Cotter, and Robert Riley, each intervened and filed their own suits against May's estate and Greyhound. The trial of all of the actions commenced before the Chancery Court of Simpson County on February 10, 1997, and concluded on February 14, 1997.

¶5. In his opinion and order entered on March 6, 1997 the chancellor found that Greyhound was 10 percent at fault for the accident and May was 90 percent at fault for the accident. The Chancellor awarded $1.1 million each for the deaths of Marcus, Nicholas, and Sumone, and further awarded $680,000 to Bonanno, $285,000 to Riley, and $50,000 to Cotter.

¶6. Greyhound appealed, and the Administrators cross-appealed. The Court of Appeals affirmed as to the liability of Greyhound, as well as the awards to the bus passengers, but reversed and remanded the damage awards for the deaths of the children. Greyhound and the Administrators each filed petitions for writs of certiorari, both of which were granted.

## ANALYSIS

*¶7.* We begin with our often cited and familiar standard of review.

> [T]his Court reviews questions of law de novo. ***Bank of Mississippi v. Hollingsworth***, 609 So.2d 422, 424 (Miss.1992).

> . . . . . . . . . . . . .

This Court will not disturb those findings [of a chancellor] unless manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Reversal is permitted only in those cases where the chancellor was manifestly in error in his finding of fact and manifestly abused his discretion. Where the factual findings of the chancellor are supported by substantial credible evidence, they are insulated from disturbance on appellate review.

*Brooks v. Brooks*, 652 So.2d 1113, 1117 (Miss. 1995) (quoting *Dillon v. Dillon*, 498 So.2d 328, 330 (Miss.1986)).

### 1. Greyhound's liability

¶8. Greyhound argues that the Court of Appeals erred in affirming the chancellor's decision regarding liability. Specifically Greyhound argues that the Court of Appeals misconstrued Miss. Code Ann. § 63-3-505 (1996) to require every driver on a through road to slow down as the driver approaches an intersection, even where the crossing road has a stop sign, because, as Greyhound asserts, the only duty of a driver on a through road is to react reasonably when the driver knows or should know that the driver on the crossing road will run the stop sign. Greyhound further argues that the opinion of the Court of Appeals is in conflict with *Jobron v. Whatley*, 250 Miss. 792, 168 So. 2d 279, 284 (1964), and *Vines v. Windham*, 606 So. 2d 128, 131 (Miss. 1992).

¶9. In response, the Administrators argue that the factual findings of a chancellor are not to be reversed where they are supported by substantial credible evidence in the record, and because they were in this particular case, the Court of Appeals properly affirmed the decision of the chancellor as to liability. Specifically, they argue that the chancellor's finding that the bus driver had a warning of several seconds before the impact is supported by the testimony of Greyhound's own witnesses and passengers. The Administrators further assert that *Jobron*, provides the reasonable interpretation to Miss. Code Ann. § 63-3-505 which Greyhound argues it should be given.[1]

¶10. On this issue, the Court of Appeals found:

We also hold the chancellor applied the proper legal standard in regard to the duty to keep a proper lookout. In *Jobron v. Whatley*, 250 Miss. 792, 168 So. 2d 279, 284 (1964), our supreme court delineated the proper standard:

Insofar as the appellee's having the right of way, or the right to assume that the driver of the other car would stop his car before entering the intersection, is concerned, this Court has repeatedly stated what the rule is, namely: That the motorist's right to assume that the driver of a vehicle proceeding toward an intersection will obey the law of the road, which requires him to stop before entering the intersection, exists only until he knows or in the exercise of ordinary care should know otherwise.

*Jobron* is very similar to the case at bar as it involved a car having the right of way which was hit by a car which ran a stop sign. *Id.* at 280. A passenger in the car that was hit filed suit against both the driver who ran the stop sign and the driver of the car she was in for failing to keep a proper lookout and failing to properly control the car after seeing the other car approaching. *Id.* The trial court in *Jobron* granted a peremptory instruction to the driver of the car the passenger was in because the court felt the passenger failed to make an issue of negligence for the jury. *Id.* Based on the evidence presented, our supreme court held "[c]ertainly it would be a question for the jury to determine,

whether or not the appellee was guilty of negligence in failing to use her brakes and slow her vehicle down so that, when it appeared Dr. White was not going to obey the stop sign and bring his vehicle to a stop, she would have had her vehicle under control and would have been able to avoid the collision."*Id.* at 282.

Turning to the case at bar, the bus driver had both the duty to slow down as he approached the intersection and a duty to brake when and if it became evident May was not going to stop for the intersection. The chancellor applied the correct legal standards. Therefore, we cannot disturb his opinion for any deficiencies with regard to the law. However, the chancellor also made factual findings that the bus driver breached both these duties. To uphold the chancellor's opinion both of these findings of fact must be supported with substantial credible evidence.

*Greyhound Lines*, slip op. ¶¶ 14-16.

¶11. After examining the evidence found in the record, the Court of Appeals went on to hold:

Substantial credible evidence supports the chancellor's finding that the driver breached his duty to slow down. First, the driver himself testified he did not start to brake until after impact. Also as stated above, evidence supports the findings that the driver was in fact speeding at 56 mph. Although there was no sign warning the driver of the intersection, this does not relieve him of his duty to slow down at that point a reasonable person would know an intersection was approaching. [Passenger] Weaver testified that he saw the lights of May's vehicle five seconds before impact. At that moment, the driver should be in the process of slowing down and keeping a proper lookout of the approaching car.

Substantial credible evidence supports the chancellor's findings that the driver was not keeping a proper lookout. Under *Jobron*, a driver has no duty to take defensive action until such time as a reasonable person would know a car approaching an intersection will not stop. *Id.* From the testimony presented, the chancellor could conclude that a driver keeping a proper lookout and paying attention would have known that May's car was not going to stop at some time before impact. The evidence shows that Weaver saw May's car and saw that it was not going to stop. Weaver was so sure it would not stop that he yelled out. This testimony comes from a passenger sitting half way down the bus and to the left of the driver and point of impact. Weaver had time to see May's vehicle, decipher that it would not stop, and had time to yell out. [Passenger] Bryant, on the other hand, testified that he never even saw May's vehicle until impact. The reasonable inference is that a driver in the front of the bus and on the side of impact who was keeping a proper lookout would know or should have known that May would not stop sometime before Weaver's yell. Since the driver failed to see May's vehicle, and therefore, could not have possibly known it would not stop, the driver breached his duty to keep a proper lookout.

*Greyhound Lines*, slip op. ¶¶ 18-19.

¶12. Miss. Code Ann. § 63-3-505 (1996) provides in relevant part:

The driver or operator of any motor vehicle must decrease speed when approaching and crossing an intersection, when approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding roadway, or when special hazard exists with respect to pedestrians or other traffic.

We find that the Court of Appeals was correct in affirming the chancellor's application of the statute to the present case. In *Fielder v. Magnolia Beverage Co.*, 757 So.2d 925 (Miss. 1999), the appellants brought an action for injuries they sustained when a delivery truck allegedly crossed the center line of the road into their lane of traffic and forced them off the road while they were negotiating a curve. *Id*. at 927-28. The jury found in favor of the defendant. *Id.* On appeal, one of the questions before the Court was whether the trial court erred in giving an instruction that stated that Fielder had a duty to decrease her speed when approaching and negotiating the curve. *Id.* at 935.

¶13. There the Court stated:

> In regards to instruction D-14, the Fielders offer this Court no argument other than their objection made at trial. At trial, the Fielders objected on grounds that **"[i]t's not every curve in this road that a person is required to reduce the speed."** The trial court overruled the objection. MBC [Magnolia Beverage Company] contends that the trial court properly gave instruction D-14, because Miss. Code Ann. § 63-3-505 states, in pertinent part, that "[t]he driver or operator of any motor vehicle must decrease speed when ... approaching and going around a curve." Miss. Code Ann. § 63-3-505 (1996).

> **In *Vise v. Vise*, 363 So.2d 548 (Miss.1978), this Court approved an instruction requiring the driver of a motor vehicle to decrease speed when approaching and going around a curve. *Id.* at 551. Therefore, according to *statutory mandate and case precedent*, we hold that the trial court properly granted instruction D-14.** Read as a whole and in context, instructions D-13 and D-14 fairly announce the law and create no injustice; thus, no reversible error is found.

*Fielder*, 757 So.2d at 936 (emphasis added). We therefore find Greyhound's argument on this issue is without merit.

¶14. Greyhound next argues that the Court of Appeals, as well as the chancellor, relied on short time estimates to support the judgment. Greyhound argues that such estimates have previously been held to be inherently unreliable, and therefore the Court of Appeals erred when it found that the estimates provided substantial evidence to support the factual findings of the chancellor. Greyhound further argues that the decision of the Court of Appeals is in conflict with *Yazoo & MVR Co. v. Lamensdorf*, 180 Miss. 426, 178 So. 80 (1938). In response, the Administrators argue that the Court of Appeals did not rely on the testimony of any single witness in finding that Greyhound's driver had a several second warning within which to stop the bus, but rather based its holding on the testimony of all of the witnesses who were passengers in the bus at the time of the collision.

¶15. In *Lamensdorf*, the Court was faced with a challenge to the weight of the evidence where a single witness testified, contrary to all of the other evidence, that the decedent's vehicle had been stalled on a train track for some forty-five seconds and that the train which struck the vehicle in which the decedent was riding had ample time to stop. 180 Miss. at 449, 178 So. at 80. There, the Court found:

> That estimate by Brock cannot be reconciled with the surrounding facts as shown by all the other witnesses; and weighing it in the scales of all ordinary human experience and observation, as it is our duty to do, it must be pronounced as incredible as a reasonable probability. It is possible, as almost anything is possible, that the length of time did intervene as Brock estimates, but we repeat that as a probability it is incredible; and we suppose it is not now necessary to more than briefly refer to what

we have so often heretofore said, to wit, that to present a possibility, rather than a believable probability, is not a sufficient basis for a verdict and judgment.

***Id.***

¶16. The Court went on to say:

> The scintilla of evidence rule has been discarded in nearly all jurisdictions, and is not recognized in this state; but verdicts must be based upon substantial evidence and that evidence must be reasonably believable. Whatever a jury here or there might chance to believe, we must require that the evidence upon which they act must be within state-wide legal standards, and one of these, as said, is that the evidence must be substantial and must be reasonably believable. Common experience and observation among all sensible men, who are impartial and without interest upon the issue, can lead to but one reasonable or substantial conclusion in respect to estimates of short periods of time, especially when that estimate, formed in a period of excitement, is in terms of seconds. So it is that all must agree with what the law books say on that subject: "Estimates of the duration of short period of time into which much experience is crowded are notoriously inexact and are apt to be excessive, especially if the mind was in a state of anxiety or expectation, and a witness who assumes to measure time with accuracy under such circumstances discredits himself." 23 C. J. p. 37, and cases there cited. *See, also*, 2 Moore on Facts, p. 992 et seq. In this case, for instance, Brock estimated the time of the train from the bridge to the crossing at 15 seconds, while his wife said it was 3 seconds, and neither of them had it right.
>
> If we were to accept the estimate of 45 seconds by Brock as the duration of time that deceased was stalled on the track and discard all the other evidence, and allow this single estimate as sufficient in dependable substance to support a verdict, it would be to say that we will accept as substantially and controllingly dependable that which is declared by the authorities to be notoriously inexact and unreliable, and, moreover, would convict this train crew as bent upon homicide, and the deceased upon suicide, or at least that he was wholly indifferent to the most compelling motive or instinct which, under all circumstances and in every eventuality, incites men to action in their own behalf, namely, the instinct of self-preservation.

180 Miss. at 450-51, 178 So.at 80-81.

¶17. In ***Lamensdorf*** this Court held that testimony based on estimates of short periods of time could not be the sole basis for a verdict where the testimony was substantially contradicted by the testimony of the other witnesses and defied logic. In the present case, two passengers testified that they saw the car at least five seconds before the impact. One of the passengers, Jackie Wayne Weaver, testified that he yelled out simultaneously with the impact, and that portion of his testimony was corroborated by the testimony of another passenger, Robert Riley. We therefore find that Greyhound's argument on this issue is without merit, and we affirm the decision of the Court of Appeals as to the liability of Greyhound.

### 2. Damage awards of the children

¶18. The Administrators argue that the Court of Appeals erred in reversing the damage awards of the children. Specifically, they argue that the Court of Appeals erred when it rejected the testimony of all of the economists and held that the damages should be based on "some type of average income for persons of the

community in which the decedents lived." *See **Greyhound Lines***, slip op. ¶ 33. Greyhound agrees that the Court of Appeals erred in holding that on remand the damages should be based on some sort of average income of the community in which the children lived.

¶19. On this issue, the Court of Appeals found:

> An award of damages by a chancellor is a finding of fact. As stated time and again, "we will not disturb the findings of a chancellor unless those findings are clearly erroneous or an erroneous legal standard was applied." *Matter of Estate of Chambers*, 711 So. 2d 878, 880-81 (Miss. 1998) (citations omitted). . . .
>
> . . . .
>
> To calculate the present cash value of the life expectancy of the deceased one need merely to take the projected annual future income of the deceased multiplied by their work life expectancy, discount it to present cash value and deduct a percentage for the deceased's personal living expenses. *Sheffield v. Sheffield*, 405 So. 2d 1314, 1318, (Miss. 1981); *see also **Jones v. Shaffer***, 573 So. 2d 740, 742 (Miss. 1990) ("In computing a person's lost net cash value, a personal consumption factor must be taken into account."). The plaintiffs' economic expert, Carroll David Channell, fixed Marcus's economic loss at $613,436, Nicholas's economic loss at $589,697, and Sumone's economic loss at $334,074. The defense's economic expert, Kenneth J. Boudreaux, testified that the present net cash value of the three children was for Marcus $1,753.04, for Nicholas $1,602.67, and for Sumone $520.30.
>
> Channell based his figures on the projected work life expectancy for each child that he attained from a February 1986 bulletin of the U.S. Department of Labor, entitled Effects of Race and Education Bulletin 2254; on the average earnings of a high school graduate, including the employer paid portion of social security adjusted for taxes, taken from the U.S. Bureau of Census CD Rom, entitled Income and Poverty 1993, with a real wage growth of .87% per year; and a personal maintenance allowance of 30% based on a study by economist Earl Cheit. Channell also discounted his sums to present value. The discrepancies between the children's economic losses were based on the discount factors used as each child would enter the workforce at different years, and the fact that a female child will earn less money and work less time over her lifetime.
>
> Boudreaux based his figures on the estimate [sic] life expectancies of each of the children using the U.S. government vital statistics tables and the work life tables of the U.S. Government Bureau of Labor Statistics; an earning amount of slightly over $8,000 a year, based on Cheryl May's income, with an allowance of a 5% increase a year; and a consumption rate of 94% from the U.S. statistical abstract of the United States. Boudreaux also discounted his sums to present value.
>
> We should start by saying that the calculation of the present net cash value of the life expectancy of a child is speculative at best for a child has no work history upon which to draw conclusions. The paramount question to be answered is what future annual income should be assigned to a child with no work history? Channell used an average income figure for a high school graduate, while Boudreaux used Cheryl May's yearly income of $8,000.
>
> The chancellor in his opinion assumed that both economists based their figures on the earning

background of the [sic] Cheryl May. This was simply not true, and it was manifest error for the chancellor to state so in his opinion. Furthermore, it is manifest error to tie the children's projected future income to that of their mother. Boudreaux himself testified that he had no opinion about what the proper base income was for any of his calculations, and he simply used Cheryl May's income figure provided to him. We see no reason to ground the future income of the children based solely on the income of the mother. We can only guess if Greyhound would still want to tie the children's future income to that of their mother if at the time of her death she was making six figures. We hold that the base income of the children should be established with some type of average income for persons of the community in which the decedents lived.

*Greyhound Lines, Inc.*, slip op. ¶¶ 27-33.

¶20. The conclusion by the Court of Appeals that the income for the children should be based on some sort of average income for persons of the community in which they lived, as far as we can find, has no basis in our law. Additionally, such a method is just as speculative as basing the recovery on the earning history of the parents. It is both unfair and prejudicial to ground the projected future income of a deceased child on either basis. Both methods result in potentially disparate recoveries for children from affluent communities or with affluent parents, as opposed to children from less affluent areas or with less affluent parents.

¶21. Who is to say that a child from the most impoverished part of the state or with extremely poor parents has less of a future earnings potential than a child from the wealthiest part of the state or with wealthy parents? Today's society is much more mobile than in the past. Additionally, there are many more educational and job-training opportunities available for children as a whole today. We must not assume that individuals forever remain shackled by the bounds of community or class. The law loves certainty and economy of effort, but the law also respects individual aptitudes and differences.

¶22. Therefore, we hold that in cases brought for the wrongful death of a child where there is no past income upon which to base a calculation of projected future income, there is a rebuttable presumption that the deceased child's income would have been the equivalent of the national average as set forth by the United States Department of Labor. This presumption will give both parties in civil actions a reasonable benchmark to follow in assessing damages. Either party may rebut the presumption by presenting relevant credible evidence to the finder of fact. Such evidence might include, but is certainly not limited to, testimony regarding the child's age, life expectancy, precocity, mental and physical health, intellectual development, and relevant family circumstances. This evidence will allow the litigants to tailor their proof to the aptitudes and talents of the individual's life being measured.

¶23. We find this standard to be equitable for all the parties because it allows the fact finder to take into account the unique circumstances of each individual person in accordance with current Mississippi case law. "Each case must depend upon its own facts." *New Orleans & Northeastern R.R. v. Thornton*, 191 So.2d 547, 551 (Miss. 1966) (citing *Illinois Cent. R.R. v. Ragan*, 252 Miss. 335, 173 So.2d 433 (1965)).

¶24. The Administrators also argue that the Court of Appeals erred in holding that it was error for the chancellor to use a consumption rate which was based on hypothetical spouses and children which would require support. They argue that it was not improper for their economist to base his opinions on hypothetical spouses and children because this Court in *Jones v. Shaffer*, 573 So. 2d 740 (Miss. 1990), reversed a damage award for funeral expenses only where the economist in that case had based his

calculations on a hypothetical spouse. Greyhound, on the other hand, argues that the Court of Appeals was correct in holding that hypothetical beneficiaries could not be used to reduce the decedents' personal consumption factor.

¶25. On this issue, the Court of Appeals found:

> The chancellor next used the personal consumption rate of 30% as advocated by Channell. Channell testified that this consumption rate was based on the projection that the children would marry and have children, or that they would have partners who would share common expenses. Channell testified that the consumption rate is lowered because with children one would consume less on oneself, and if married one would consume less than if one were single. Channell further testified that for a forty-five year old man who had never married and lived alone, he would use a 60% consumption rate. On cross-examination, Channell testified as follows:

> Well, case specific, no. For young children you have an issue that -- the question is -- the economic question is, what position are they going to be in over the remainder of their lives? Are they going to be married? Are they going to live with someone? Are they going to have a roommate? Are they going to -- do they have sisters or other relatives that are going to survive them? If that's the case, then a thirty percent consumption allowance is certainly appropriate because the income they earn could be available to the support of family members, could be available to the support of parents in their old age. There are numerous things that are allocations that can be made from that income.

> When [you] go up to -- you try to use personal savings rates of three percent and a consumption rate of ninety-seven percent, then certainly that's out of line in my view. That's not personal consumption. In fact, I would argue that the maintenance allowance should consist of that amount of monies necessary to sustain a meaningful life style. In other words, food, clothes, shelter, transportation.

> Channell's testimony was that the children would be spending money on hypothetical future spouses and children, therefore their consumption rate is lowered to account for the money that would have been spent on support of the hypothetical future spouses and children. It is an attempt to allow beneficiaries to recover money that the deceased would have spent on them during the deceased's lifetime by lowering the deceased's personal consumption rate. In essence, to allow beneficiaries to recover everything they would have received if the deceased had lived. We hold that it was manifest error for the chancellor to use a consumption rate which is based on a hypothetical prospect that the children would eventually have a spouse and have children of their own, both of which require support.

> . . . .

> Mississippi has never adopted the idea of lowering a consumption rate or increasing a saving rate to specifically make up for money spent on statutory beneficiaries during the deceased's lifetime. We decline to offer any opinion as to whether Mississippi recognizes such a calculation in determining the present net cash value of the life expectancy of the deceased. However, even if Mississippi recognized such, it would not be proper in this instance as the children were not supporting anyone at the time of their deaths.

*Greyhound Lines* slip op. ¶¶ 34-37.

¶26. Contrary to the opinion of the Court of Appeals, we have indeed recognized personal consumption factors. In *Jones v. Shaffer*, 573 So. 2d 740 (Miss. 1990), a wrongful death action was brought for the death of an unmarried twenty-two year old who only left his five brothers and three sisters surviving him. We found that the trial court erred in not granting a new trial when the jury awarded damages for funeral expenses only, and in so doing, we stated:

> Dr. Paul Oliver, an expert in the field of economics, testified for the plaintiff. He was the only such expert to testify in the case. According to Dr. Oliver, the average work life expectancy of a 22 year old male person is 41 years. In computing a person's lost net cash value, **a personal consumption factor must be taken into account**. In his direct testimony, he indicated that the decedent's personal maintenance consumption allowance would be twenty-six per cent, which is for a two person family and the highest percentage shown by the tables of the Department of Labor. Using that rate, Dr. Oliver testified for the last full year the decedent worked, he earned $9,900, which computed the present value of the decedent's lost income at $171,000.00. This did not take into account any taxes that might be paid during the decedent's life, had he lived.

> On cross examination by Mr. Sanders, attorney for the defendant, Kim Shaffer, Dr. Oliver was asked to compute the decedent's lost income using 40% as the deceased personal consumption rate and Dr. Oliver arrived at the decedent's lost net income as $101,142.00. On further cross examination by the attorney for Jeffries' Trucking, Dr. Oliver was asked to assume that the decedent's personal consumption rate was 67% and Dr. Oliver arrived at the decedent's lost net income at $70,495.00. **It is incredible that the verdict ignored and did not respond favorably to this element of damages.**

*Id.* at 742 (emphasis added).

¶27. Today we hold that the consumption rate is another factor which may be argued by the parties to the finder of fact in support of increasing or decreasing the presumption that the deceased child's income would have been equivalent to the national average. The credibility and weight of such testimony as are to be determined solely by the finder of fact. As the Court of Appeals observed in the present case, Channell based his testimony and calculations on the average earnings of a high school graduate and a personal maintenance allowance of 30% based on a study by economist Earl Cheit. *Greyhound Lines,* slip op. ¶ 30. The chancellor chose to give credence to Channell's testimony, and rendered a verdict accordingly. This aspect of the chancellor's decision was supported by substantial evidence, and as a result, we cannot say that the chancellor erred. We therefore reverse the decision of the Court of Appeals and reinstate the damage awards for the death of the children.

## CONCLUSION

¶28. We conclude that the chancellor did not err in finding Greyhound 10 percent at fault in this collision, and therefore, we affirm the decision of the Court of Appeals as to the liability of Greyhound. As to the damage awards for the death of the children, we hold that in cases brought for the wrongful death of a child where there is no past income upon which to base a calculation of projected future income, there is a rebuttable presumption that the deceased child's income would have been the equivalent of the national average as set forth by the United States Department of Labor. However, that presumption may be rebutted by presenting other relevant credible evidence as will aid the finder of fact in making its determination. We further hold that the consumption rate is one such factor that may be taken into account

by the finder of fact. Finally, we find that in the present case the chancellor's damage awards were supported by substantial evidence, and we therefore reverse the decision of the Court of Appeals and reinstate the damage awards for the deaths of the children.

¶29. **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED IN PART AND REVERSED IN PART.**

**PRATHER, C.J., PITTMAN, P.J., McRAE AND WALLER, JJ., CONCUR. COBB, J., CONCURS IN PART. SMITH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, P.J., AND COBB, J. DIAZ, J., NOT PARTICIPATING.**

**SMITH, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶30. I agree with the majority opinion insofar as it affirms the decision of the Court of Appeals as to the liability of Greyhound Lines, Inc. However, I disagree with the majority's conclusion that the chancellor correctly utilized evidence of a consumption rate based upon hypothetical spouses and children which would require the support of the deceased. Therefore, I respectfully dissent.

¶31. In my view, the majority erroneously relies upon *Jones v. Shaffer*, 573 So. 2d 740 (Miss. 1990), as authority for the correct treatment of net cash value. In calculating the damage award for the deceased children, the chancellor utilized evidence of a consumption rate based upon hypothetical spouses and children which would require the support of the deceased. The Court of Appeals held that it was error to base the children's personal consumption factors on a hypothetical prospect that the children would eventually have a spouse and children of their own, both of which would require support. The Court of Appeals stated, "Mississippi has never adopted the idea of lowering a consumption rate or increasing a saving rate to specifically make up for money spent on statutory beneficiaries during the deceased's lifetime. . . . However, even if Mississippi recognized such, it would not be proper in this instance as the children were not supporting anyone at the time of their deaths." *Greyhound Lines, Inc. v. Sutton*, No. 97-CA-00637-SCT, slip. op.¶ 37

¶32. The majority states, "Contrary to the opinion of the Court of Appeals, we have indeed recognized personal consumption factors," citing *Shaffer*. Majority Op. at *16. The majority's treatment of *Shaffer*, however, is misguided. The question is not whether this Court has ever recognized personal consumption factors. We undisputably have. In *Shaffer*, this Court stated, "In computing a person's lost net cash value, a personal consumption factor must be taken into account." *Shaffer*, 573 So. 2d at 742. Neither Greyhound nor Sutton argues, and the Court of Appeals did not hold, that this Court should not recognize a personal consumption factor. The question is whether we have ever allowed the personal consumption factor to be decreased based on hypothetical spouses and children. *Shaffer* does not speak to this question.

¶33. In *Shaffer*, the deceased, a twenty-two year old male, was unmarried at the time of his death and had no children. He was survived by five brothers and three sisters. The trial court instructed the jury on the following elements of damages: (1) funeral expenses of the deceased; (2) net cash value, life expectancy of the deceased; (3) pain, suffering and mental anguish; and (4) loss of companionship to the siblings. The jury, however, returned a verdict for the plaintiff only in the exact amount of the funeral expenses. The trial court refused to grant the motion for new trial on the issue of damages. This Court reversed. In its opinion, the Court separately examined the evidence put before the jury regarding each of the above four elements of

damages. In discussing net cash value, the Court reviewed the testimony of Dr. Paul Oliver, the plaintiff's expert economist. Oliver was the only economic expert to testify in the case. Oliver testified that the decedent's personal maintenance consumption allowance would be 26%, which is for a two-person family. On cross-examination, one defense attorney asked Oliver to compute the decedent's lost income using a 40% personal consumption rate. On further cross-examination, the other defense attorney asked Oliver to compute the decedent's lost income assuming at personal consumption rate of 67%. Thus, no matter which rate the jury accepted as accurate, whether it was the 26% rate, the 40% rate, or the 67% rate, the jury would have had to award **something** for net cash value. Instead, the jury awarded only funeral expenses. Thus, this Court found error. The Court stated, "It is incredible that the verdict ignored and did not respond favorably to this element of damages." *Id.* By finding such, this Court did not necessarily approve Oliver's first computation of 26% which took into consideration a two-person family. Rather, the Court merely stated that the verdict did not respond to the evidence which established that, at worst, the consumption rate was 67%.

¶34. Returning to the case at hand, the majority concludes that "the consumption rate is another factor which may be argued by the parties to the finder of fact in support of increasing or decreasing the presumption that the deceased child's income would have been equivalent to the national average." Majority Op. at *17. Interestingly, neither of the parties have argued that consumption rate should not be argued by the parties to the fact finder. The parties have argued over whether the consumption rate should take into account hypothetical dependents. *Shaffer* does not address this question, and neither does the majority.

¶35. Furthermore, the majority refuses to disturb the chancellor's decision to credit David Channell's testimony regarding the personal consumption rate because, the majority concludes, the decision was supported by substantial evidence. However, whether the consumption rate should take into account hypothetical dependents is a question of law, not a question of fact, which this Court should review de novo. *McNeil v. Hester*, 753 So. 2d 1057, 1063 (Miss. 2000) (citing *Consolidated Pipe & Supply Co. v. Colter*, 735 So. 2d 958, 961 (Miss. 1999); *Harrison County v. City of Gulfport*, 557 So. 2d 780, 784 (Miss. 1990); *Cole v. National Life Ins. Co.*, 549 So. 2d 1301, 1303 (Miss. 1989)).

¶36. For the foregoing reasons, I respectfully concur in part and dissent in part.

**BANKS, P.J., AND COBB, J., JOIN THIS OPINION.**

1. The Administrators do not appear to agree with Greyhound's assertion that the Court of Appeals's interpretation of Miss. Code Ann. § 63-3-505 is unreasonable. Rather, the Administrators only argue that the Court has given reasonable interpretations to the statute in the past, and in the present case, because the bus driver had warning that the car was going to run the stop sign, the driver should have applied his brakes.