PEERLESS SUPPLY CO., INC. *v.* JETER.

June 8, 1953

No. 38776 34 Adv. S. 149 65 So. 2d 240

*Laub, Adams, Forman & Truly,* Natchez, for appellant.

*Riley & Johnson* and *W. A. Geisenberger,* Natchez, for appellee.

64

ROBERDS, P. J.

Mrs. Jeter recovered a judgment for $7,500.00 against appellant for personal injuries she claimed resulted to her from the negligence of appellant.

On this appeal appellant contends (1) the proof fails to show it was guilty of any negligence and that, therefore, its motion for a peremptory instruction on liability should have been sustained; (2) that the trial court committed reversible error in granting to plaintiff the hereinafter quoted instruction; and (3) that the amount of the verdict is excessive.

On the question of negligence Mrs. Jeter was permitted to invoke the doctrine of res ipsa loquitur, but she also contends that she sufficiently established negligence by other evidence aside from such doctrine. Appellant takes issue on both propositions. This makes it necessary to set out, in substance, the testimony disclosing the facts and circumstances surrounding the accident.

About 3:30 o'clock in the afternoon of February 12, 1952, Mrs. Jeter, in her husband's automobile, accompanied by her little girl, was driving south on U. S. Highway 61 in the southern part of the City of Natchez, Mississippi. At the same time a large trailer-truck belonging to appellant was being driven north on the same Highway by its servant Joe A. Rosalee. Just as the two vehicles were passing the right, outside rear dual wheel became detached from the trailer, ran across the road to the west, collided with the front of the car being driven Mrs. Jeter, causing, as she claims, an injury to

the sacroiliac joint at the lower part of her spinal column. Mrs. Jeter examined the wheel, the rim and the tire right after the accident. She testified the metal part of the wheel was very hot; that it would "sizzle" when water came into contact with it. This wheel was held in place by ten bolts, or lugs, running through openings in the metal part of the wheel. She said the openings, or holes, through which these bolts passed were "wallowed out" about twice their size, and the lug bolts had melted; that the holes were of different shapes due to their being "wallowed out." Mr. Jeter also examined the wheel after it was taken to a garage. He said that all but two of the openings were "elongated"; that the holes through which the bolts, or lugs, passed, were worn from a normal diameter of one and an eighth inch to two inches. He said the wheel was attached by use of ten bolts or lugs; that two of the holes were in fair condition but the other eight "had been wallowed out to, I would say, half again their normal size, some maybe a size over again. I would say those lug holes had been reamed out to at least two and one-half inches." Rosalee, servant of appellant and driver of the trailer-truck, testified, "I found the ten bolts that hold both sets of wheels on, about eight had been stripped off flush, and two were there, but the threads were all wallowed off, stripped—even with the brake drum." Another witness said the bolts had been "seared" off. Rosalee was asked, "Q. You say you examined this wheel that came off your truck? A. Yes, sir. Q. What was the diameter of these holes where the lugs fitted into place? A. You mean after they had been wallowed out? Q. They had been wallowed out? A. Yes, sir. Q. What was the diameter? A. From three-eighths to one inch, I imagine." He said three of the lugs were sticking out of the drum. "Q. What about the rest of them? A. They were stripped off." Other witnesses testified to the condition of the wheel after it came off. There is no dispute that the wheel was very hot; that the lugs were

seared off; that eight of the lug openings were about twice their normal size. It might be added that immediately after the right rear outside wheel had run off, the inside wheel also became detached and went in the same direction as the first but it caused no injury. Thereupon the axle dropped to the pavement and the driver then noticed something was wrong and went back to ascertain the trouble and examine for the cause thereof. Each of these wheels weighed about three hundred pounds. The weight of the trailer-truck, as then loaded, was 52,-000 pounds. All of the witnesses agree that the cause of the heated condition of the wheel, the searing off of the bolts, the "wallowing out" of the holes, and the breaking away of the wheel from the trailer were caused by the operation of the trailer-truck after the lug-nuts had become loose; that if these nuts had been as tight as they were supposed to be the accident would not have happened. However, the cause of the nuts being loose is not shown. Rosalee said he could not account for it. In other words, the initial cause of the accident is not explained. It is further in evidence that if proper inspection of the wheel at appropriate times had been made the looseness of the nuts would have been disclosed and detected.

Was this a proper case for application of the doctrine of res ipsa loquitur? 65 C. J. S., pg. 987, Sec. 220(2) sets out this definition of that doctrine: █ "The doctrine of res ipsa loquitur, which is recognized in almost all jurisdictions, is that, where the thing which causes an injury is shown to be under the management of defendant or his servants and the accident is such as in the ordinary course of things does not happen if those who have its management or control use proper care, it affords reasonable evidence, in the absence of explanation by defendant, that the accident arose from want of care."

The last definition of the doctrine used by this Court is found quoted from 38 Am. Jur. 989, Sec. 295, in these words: "The conclusion to be drawn from the cases as

to what constitutes the rule of res ipsa loquitur is that proof that the thing which caused the injury to the plaintiff was under the control and management of the defendant, and that the occurrence was such as in the ordinary course of things would not happen if those who had its control or management used proper care, affords sufficient evidence, or, as some time stated by the courts, in the absence of explanation by the defendant, that the injury arose from or was caused by the defendant's want of care.'' Pongetti v. Spraggins, 215 Miss. 397, 61 So. 2d 158. See also the following Mississippi cases: Alabama & V. Ry. Co. v. Groome, 97 Miss. 201, 52 So. 703; Waddle v. Sutherland, 156 Miss. 540, 126 So. 201; Miss. Power & Light Co. v. Sumner Gin Co., 156 Miss. 830, 127 So. 284; Penney & Co. v. Evans, 172 Miss. 900, 160 So. 779; Sanders v. Smith, 200 Miss. 551, 27 So. 2d 889; Palmer v. Clarksdale Hospital, 206 Miss. 680, 40 So. 2d 582. Here the instrumentality that caused the injury was under the exclusive control and management of defendant; the accident was such as in the ordinary course of things would not have happened had defendant used proper care, and the initial cause of the accident is not explained. ▉▉▉ We think the doctrine of res ipsa loquitur applies.

In addition, on the question of negligence vel non, the testimony is in conflict as to when, as to distance traveled, this wheel, in the exercise of due care, should have been inspected for loose nuts or other defects, and the manner of making such inspection, and the proof of plaintiff, which the jury had the right to accept, was to the effect that neither as to the time nor manner did defendant examine and inspect this wheel as custom and ordinary care required.

This instruction was granted plaintiff:

''The Court instructs the jury for the plaintiff that though the burden rests upon the plaintiff to prove by a preponderance of evidence that the defendant was guilty of negligence, which was the sole and proximate cause

of the damages, if any, which plaintiff sustained, and this burden never shifts to the defendant, yet if you believe from a preponderance of the evidence in this case that the trailer was under the management and control of the defendant at the time and place of the accident herein complained of, and further believe from a preponderance of the evidence that said accident was such as does not in the ordinary course of things, happen, if the person in management and control uses reasonable care and caution, it affords reasonable evidence, in the absence of explanation, that the accident was the result of want of care on the part of the defendant.''

Appellant says this instruction placed upon it the duty of showing the specific cause of the accident, else the fact of the accident would be evidence of its negligence, whereas the rule is that, even though the cause cannot be explained, as is often the case, yet if defendant can show he has used reasonable diligence to prevent the happening, there is no liability. ▆▆ The instruction might have been drawn more clearly and specifically but we do not think it mislead the jury. The test of liability, of course, is not whether defendant can explain the specific cause producing the conditions which brought about the injury, but whether defendant has been guilty of negligence which was the proximate cause of the injury. That requisite and paramount idea stands out and runs throughout the instruction. But if the form of the instruction be doubtful, we still do not think this reversible error for the reason that the instructions granted to defendant kept constantly before the jurors, as a prerequisite to their right to impose liability on defendant, their duty to find, from a preponderance of the testimony, that the defendant was guilty of negligence which proximately produced the injury. For instance, one instruction granted defendant charged the jurors that before they could return a verdict against defendant they would have to find ''that the defendant was guilty of some act of negligence which contributed to the injury of

the plaintiff and that if you believe that the injury complained of by the plaintiff was caused by an unavoidable accident, then· your verdict must be for the defendant.''

Appellant says the verdict of $7,500.00 was so excessive as that we should either require a remittitur here or reverse the case for another jury to assess the damages. We are impressed by the contention and it has given us much concern. Mrs. Jeter testified she has severe pains in the lower part of her back; that she never had these before the accident; that she has difficulty doing her housework; she has a husband and two girls, six and eight years of age; that she is twenty-six years of age; that theretofore she had assisted in operating her husband's store at Doloroso, in Wilkinson County, Mississippi; that the injury has greatly interfered with her home and store work; that she gets tired very easily; cannot remain long upon her feet; that the pains interfere with her sleep; that she can only lift objects of small weight; that the day after the accident on February 12th she went to Dr. Whittington, who examined and prescribed for her; that from the time of the accident to the time of the trial July 15, 1952, some five months, she had been wearing a supporting brace—a leather or rubber belt to support her and hold the vertebrae in place. Mrs. Jeter was a justice of the peace but there is no claim that her injuries appreciably interfere with the discharge of her judicial duties.

Dr. Homer Whittington testified that he was the family doctor for the Jeters; that Mrs. Jeter came to see him on February 14th; that she was complaining of a pain in her back; that he examined her and found ''She was pretty well bruised up all over, that is her legs and knees were bruised, also right shoulder, complained of pain in the lower part of her spine, found she had a sprain of the vertebra at the sacroiliac joint.'' That injury, he said, was very painful; that he had been her family doctor for a number of years and she had never

complained of that pain before. He has seen her a number of times since the accident; when she came she was strapped with adhesive. He gave her a sedative to ease the pain. He put her in a brace, which she is still wearing. He has been giving her diathermy treatments about twice a week since the injury. Asked if the injury was permanent he said, "I would say a sacroiliac sprain is always permanent, more or less." He said that usually this trouble "will get stationary and heal in place for a while and stop hurting, and then a slight twist and it will be slipped out of place again and hurt just as bad as it did to start with. It comes and goes." Asked if her condition would require surgery he replied "That would be hard to determine now." On cross examination he explained the injury was at the end of the spinal cord; that it was the last vertebra or joint of that cord; that there were strong ligaments which hold the vertebra in place as it sits on the pelvic, and when these ligaments are torn, as here, the vertebra will slip back and forth as it rests upon the pelvic and frequently this is upon the nerves and is very painful. He was asked if the injury was permanent and said "It will probably come back because a majority of them do." His bill for her treatment to the time of the trial was $230.00.

Dealing with the amount of verdicts is one of the most troublesome questions with which the courts have to struggle. ██ ██ There is no exact yardstick, or measurement, by which to test the question. Each case must depend upon its own facts. The test is not what amount the members of the court would have awarded had they been upon the jury, or what they, as an appellate court, think should have been awarded, but whether the verdict is so excessive as to indicate that the jury was animated by passion, prejudice, or corruption. Penney Co. v. Evans, supra. ██ ██ We think the verdict was large, but considering all the circumstances, including the age of the plain-

tiff, we are not able to say the amount of the verdict was the result of passion, prejudice or corruption.

Affirmed.

*Kyle, Holmes, Ethridge* and *Lotterhos, JJ.*, concur.