# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-00692-SCT


*CLASSIC COACH, INC. AND ALBERT RUSH, SR.*

*v.*

*JAMES JOHNSON, INDIVIDUALLY, AND ON BEHALF OF APRIL JOHNSON AND JENNA JOHNSON, MINORS, MARLENE JOHNSON, JULIE JOHNSON AND ALL HEIRS-AT-LAW OF MATTHEW JOHNSON, DECEASED*


## CONSOLIDATED WITH

## NO. 2000-CA-00694-SCT


*CLASSIC COACH, INC. AND ALBERT RUSH, SR.*

*v.*

*RACHEL McBRIDE, NEXT OF KIN, HEIR AND ADMINISTRATRIX OF THE ESTATE OF LARRY McBRIDE, DECEASED, INDIVIDUALLY AND WRONGFUL DEATH BENEFICIARY OF LARRY McBRIDE, DECEASED*


| | |
|---|---|
| DATE OF JUDGMENT: | 12/21/1999 |
| TRIAL JUDGE: | HON. JOHN L. HATCHER |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | CHRISTOPHER J. AUBERT |
| | JAMES PHILIP MEYER |
| | DARREN MILTON GUILLOT |
| | ROBERT SHIELDS CRUMP |
| ATTORNEYS FOR APPELLEES: | D. BRIGGS SMITH |
| | CLARENCE MCDONALD LELAND |
| | JERRY JOHNSON |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |

DISPOSITION:      AFFIRMED IN PART; REVERSED & REMANDED IN PART - 08/01/2002

MOTION FOR REHEARING FILED:

MANDATE ISSUED:      8/22/2002

**BEFORE PITTMAN, C.J., DIAZ AND EASLEY, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1. James Johnson, individually and on behalf of April Johnson and Jenna Johnson, Minors, Marlene Johnson, Julie Johnson and all heirs-at-law of Matthew Johnson, deceased (Johnsons) and Rachel McBride, Next of Kin, Heir and Administratrix of the Estate of Larry McBride, deceased, individually and wrongful death beneficiary of Larry McBride (McBrides) filed separate actions in Tunica County against the Mississippi Department of Transportation (MDOT), Mississippi Department of Public Safety (MDPS), Classic Coach, Inc. (Classic Coach), and Albert Rush, Sr. (Rush), alleging negligence, wrongful death and loss of consortium. On February 15, 1999, the cases were consolidated for non-jury trial before Circuit Judge John L. Hatcher. On January 4, 2000, the trial court issued separate judgments in favor of the Johnsons and the McBrides against Classic Coach, Rush, and MDOT. The trial court then assessed total damages in the amounts of $2,600,000.00 for the McBrides and $2,000,000.00 for the Johnsons. In rendering judgment, the trial court apportioned fault as follows: 10% against Larry McBride (Larry), a non-party tortfeasor, 54% against Classic Coach and Rush and 36% against MDOT, for a total apportionment of fault of 100%. On April 24, 2000, Classic Coach and Rush appealed the judgments of the trial judge.

¶2. Because of the MTCA statutory cap on damages against governmental entities, MDOT was only required to pay $50,000.00 to the McBrides and Johnsons, and have thus, settled out of court and are no longer a party to this matter. MDOT's withdrawal from this appeal has been granted by this Court.

## FACTS

¶3. On December 13, 1993, in the early morning hours after 3:00 a.m., a fatal collision occurred at the intersection of U.S. Highway 61 and Highway 304 in Tunica County when a car driven by Larry collided with a commercial passenger bus operated by Rush and owned by Classic Coach. Larry and Matthew Johnson (Matthew), the passenger in the car, died as a result of the accident.

¶4. At the time of the accident, U.S. Highway 61 was a two-lane federal highway which ran north to south while Highway 304 was a two-lane state highway which ran east to west. Highway 304 intersected U.S. Highway 61 at approximately a one hundred thirty-five (135) degree angle in a northeast to southwest direction. U.S. Highway 61 was also considered to be a "through" highway as determined by the placement of stop signs at both entrances to the intersection from Highway 304.

¶5. Prior to this accident, the stop sign directing west bound traffic on Highway 304 had been knocked down in an unrelated accident. The fallen stop sign was reported as irreparable to the Mississippi Highway Patrol and the MDOT, but the sign was not replaced until after the accident in question.

¶6. On the night of the collision, Rush was driving the forty-foot-long passenger bus north on U.S. Highway 61 toward its intersection with Highway 304. Larry and Matthew were traveling west on Highway 304 in Larry's 1994 Honda Prelude. Rush first noticed Larry's car when it was approximately 160 to 200 feet from the intersection, and he stated he continued to watch for the approaching car as well as other cars coming from the east and the west on Highway 304. As Rush neared the intersection, he removed his foot from the accelerator and placed it over the brake. Rush then observed the lights of Larry's car "raise" indicating that Larry was not going to stop, but at this point the cars were only two feet from the intersection. Rush then locked his arms to the steering wheel and, for the first time since approaching the intersection, he applied the brakes as the bus and car collided.

¶7. After the accident samples of Larry's and Matthew's blood and urine were collected to be used in drug screens conducted by the Mississippi Crime Laboratory. Both samples of blood were positive for methamphetamine, and both samples of urine were positive for amphetamines, methamphetamine and marijuana. One expert testified Larry most likely ingested the methamphetamine six to twelve hours before the accident and was under the influence of the drug at the time of the accident. The Crime Lab destroyed the samples before the quantity of methamphetamine in Larry's blood could be determined. Without a specific quantity of methamphetamine, neither expert could reach a conclusion as to what effect, if any, the drug had on Larry; therefore, the trial judge disregarded all evidence and testimony concerning the decedents' blood and urine samples.

## DISCUSSION

### I. Whether the Substantial Credible Evidence Presented on Record Supported the Trial Judge's Allocation of Fault for Each Tortfeasor.

¶8. This Court reviews the factual determinations made by a trial judge sitting without a jury using the substantial evidence standard. *Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc.*, 716 So. 2d 200, 204 (Miss. 1998) (citing *Hill v. Thompson*, 564 So.2d 1, 10 (Miss. 1989); *UHS-Qualicare v. Gulf Coast Community Hosp., Inc.*, 525 So.2d 746, 753 (Miss. 1987)). "We will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Id*. (citing *Herring Gas Co. v. Whiddon*, 616 So.2d 892, 894 (Miss. 1993); *Broadhead v. Bonita Lakes Mall, Ltd. Partnership*, 702 So.2d 92, 96 (Miss. 1997)).

¶9. Contrary to the belief of Classic Coach and Rush, the trial judge did not allocate fault in excess of one hundred percent. Instead of finding fault in terms of total damages, the trial judge allocated fault in terms of recoverable damages. The trial judge found Classic Coach to be 60% liable for the "remaining recoverable damages." Recoverable damages are the total damages minus any damages allocated to other parties. *DePriest v. Barber*, 798 So. 2d 456, 459 (Miss. 2001). Because Larry, as a non-party tortfeasor, was found to be 10% liable, Classic Coach was then found to be only 54% liable for the Johnsons' and McBrides' total damages (60% liable for the remaining recoverable damages of 90%). Following the same logic, the MDOT was found to be only 36% liable, not 40%. Throughout the remainder of this opinion, this Court will refer to Classic Coach's percentage of fault as 54% liable for the Johnsons' and McBrides' total damages.

¶10. Classic Coach contends that the trial judge was manifestly wrong in allocating 54% of the fault it while only allocating 36% to the MDOT and finding Larry only 10% contributorily negligent. Classic Coach

argues that MDOT and Larry alone were the sole contributors to the accident in question. The MDOT failed to promptly replace a stop sign at an intersection which was known to be dangerous. Larry failed to observe several signs and warnings of the approaching intersection, and thus, failed to yield the right of way to Rush and the passenger bus. Classic Coach asks that this Court consider, based on the evidence, increasing the allocation of fault of the MDOT and of Larry and in turn decreasing their own liability.

¶11. Because the MDOT has been released from this suit, it is not necessary to address the specific issues raised in its brief, but its negligence and allocation of fault will be discussed.

### A. The Negligence of MDOT

¶12. On December 11, 1993, approximately two days before the accident in question, an unrelated accident occurred at the intersection of U.S. Highway 61 and Highway 304 in which the stop sign controlling west bound traffic on Highway 304 was knocked down. The Mississippi Highway Patrol and the MDOT were informed of the situation. Both departments knew of the dangerousness of the intersection, but unfortunately the stop sign was not replaced until after the December 13 wreck.

¶13. Although replacing traffic control signs is a discretionary duty of the MDOT, it did have a duty to warn the drivers of dangerous conditions of which it had notice. *Jones v. Miss. Dep't of Transp.*, 744 So. 2d 256, 263 (Miss. 1999). According to Miss. Code Ann. § 63-3-301 (1996), a manual and specifications for traffic control devises used on highways shall be adopted by the public safety commissioner. Miss. Code Ann. § 63-3-303 (1996), further states the public safety commissioner shall also conform to its manual and specifications in placing and maintaining those traffic control devices on the highways. At trial it was undisputed that the official manual and specifications adopted by the MDOT was the Manual of Uniform Traffic Control Devices (MUTCD) which stated stop signs which were knocked down or damaged were to be replaced without undue delay. The stop sign was not replaced until over thirty hours after the initial accident occurred on the night of December 11, 1993.

¶14. Officer Andrew Richardson (Officer Richardson) handled both accidents occurring at the intersection of Highway 304 and U.S. Highway 61. After the accident occurred on December 11, 1993, Officer Richardson immediately placed a call to Matt Newson (Newson) of the Highway Patrol to report the downed stop sign. Following proper procedure Newson placed a call to Jimmy McGregory (McGregory) in the Batesville MDOT office. McGregory pinned a note to the message board reporting the downed stop sign in Tunica. In his deposition, McGregory stated that he told Newson the sign would be replaced on Monday. After Newson spoke with McGregory, he called Officer Richardson to inform him the MDOT had been notified, but there is no mention in the record Officer Richardson was told the sign would not be replaced until Monday. Officer Richardson left the scene with one of the drivers without taking any precautionary measures to warn any of the traffic of the missing stop sign.

¶15. Kelvin Norwood (Norwood) of the MDOT testified that although it was his duty to patrol the highways for signs which had been damaged or knocked down, it was not his custom to patrol on Saturdays or Sundays. Derry Williams (Williams), who was also employed by the MDOT, traveled on Highway 304 the night of December 11. Williams testified that although he did notice the directional signs had been knocked down as a result of an accident, he did not notice that the stop sign had been knocked down as well. Williams did not report the situation to his superiors. Walter Lyons (Lyons), a representative of the MDOT, testified that in his opinion Officer Richardson should have stayed at the scene when the stop sign was knocked down or, at the very least, Officer Richardson should have continued to check on the

status of the replacement stop sign.

¶16. After reviewing all the evidence presented at trial, the trial judge found MDOT to be 36% liable for the accident which occurred on December 13, 1993. Although the MDOT claimed immunity from any liability, the trial judge found the failure to replace a stop sign without undue delay which controlled traffic for a intersection known by the MDOT to be dangerous constituted negligence and, thus, immunity could not be claimed. As stated above, this Court may not overturn a trial judge's finding of fact unless it is shown that the trial court was manifestly wrong in its decision. This Court is unable to find any such manifest error by the trial judge and affirms its allocation of fault of 36% to the MDOT.

## B. The Negligence of Larry McBride and James Johnson

¶17. Larry and Matthew were traveling west on Highway 304 on the morning of December 13, 1993, after having spent the evening in Memphis looking for prospective employment. This was an unfamiliar highway to Larry, and there were no lights on the road. On his way to the intersection, Larry passed several warning signs indicating he was approaching an intersection. A "stop ahead" sign and an intersection or junction sign were both located several hundred feet from the intersection. Highway 304 also began to widen to allow traffic to merge with U.S. Highway 61. Classic Coach also mentioned several other signs and occurrences, but many of these warning signs were deemed to be in disrepair and unrecognizable at trial, even by Officer Richardson. As Larry approached the unfamiliar intersection and with no stop sign to indicate his duty to stop, Larry proceeded through the intersection without yielding the right of way to the oncoming passenger bus.

¶18. According to Miss. Code Ann. § 63-3-805 (1996), Larry as a driver on an inferior street has the duty to yield the right of way to through street traffic which poses an immediate hazard. In *McKinzie v. Coon*, 656 So. 2d 134, 141-42 (Miss. 1995), this Court determined an immediate hazard exists when a vehicle is 100 to 200 feet from the intersection. Rush testified that he first became aware of Larry's car when he was approximately 160 to 200 feet from the intersection. Rush also testified that he became aware that Larry was not going to stop at the stop sign when the cars were only two feet from the intersection. According to the standard in *McKinzie*, an immediate hazard was created when Rush first became aware of Larry's car; and therefore, Larry should have yielded the right of way to the passenger bus. *Id.* at 141-42. Larry acted negligently when he failed to yield the right of way to Rush and the passenger bus.

¶19. In determining Larry's percentage of fault Classic Coach argues the trial judge was clearly erroneous in disregarding the evidence of drugs found in Larry's and Matthew's blood and urine. Methamphetamine was found in the blood and in the urine of Larry and Matthew, and amphetamines and marijuana were also found in the urine. The trial judge ruled this evidence inadmissible as to relevancy in regards to Matthew because he was only a passenger in the car, but he chose to hear expert testimony in regards to Larry. One expert stated due to the presence of the methamphetamine in the blood, it was most likely that Larry ingested the drugs six to twelve hours before the accident. Both experts agreed that the methamphetamine most likely had some effect on Larry since it was found in his blood, but one expert indicated methamphetamine could be used to enhance performance, stating that the drug was sometimes used to overcome fatigue. Because methamphetamine is a stimulant and marijuana is a depressant, one expert also stated the effects of one could have cancelled out the effects of the other.

¶20. The trial judge heard the testimony of the experts from both sides as they described the possible effects of methamphetamine if found in a person's blood. The problem arose when the Mississippi Crime

Lab destroyed the blood samples before a quantitative amount of the drug could be determined. Without the exact quantitative amount, neither expert could conclude with a medical certainty what influence or effect the drug had on Larry. Without specific medical testimony upon which to rely, the trial judge disregarded all evidence and testimony regarding drugs found in Larry's blood.

¶21. Classic Coach correctly argues that under *Allen v. Blanks*, 384 So. 2d 63, 67 (Miss. 1980) even the slightest impairment can be considered when determining fault. This Court in *Allen* went on to hold that consumption of even a small quantity of alcohol or drugs *may* significantly impair reaction time. *Id*. (emphasis added). This fact may be presented to the fact finder to make him aware of the legal effects of intoxication and to further aid him in determining if intoxication and proximate cause appear from the evidence presented. *Id*. In the case sub judice, the trial judge was presented with the evidence and, finding that no testimony directly indicated that Larry was, in fact, under the influence of the drug, disregarded all such testimony.

¶22. Classic Coach also asserts that Matthew should have been found to be contributorily negligent by choosing to ride in the car with Larry whom he knew to be under the influence of drugs. For the reasons stated above, the trial court was not able to determine from the evidence that Larry was, in fact, under the influence of any drugs. There was no evidence to show that Larry and Matthew took drugs together, and there was also no evidence to show the amount of drugs in their blood at the time of the accident. Therefore, Matthew could not be found negligent for riding in the car with Larry. The trial judge also found Matthew's drug test to be irrelevant as to the question of negligence because he was a mere passenger and not a driver. Therefore, the trial judge did not allow any testimony regarding the results of Matthew's drug tests to be admitted into evidence.

¶23. The trial court did recognize that Larry was somewhat negligent in the accident and allocated 10% of the total fault to him. The trial court, as finder of fact, examined all the relevant evidence and correctly found Larry contributorily negligent. Although Larry may have been more than 10% contributorily negligent, this difference of conclusion does not rise to the appropriate level of abuse of discretion set forth in the above stated standard of review which would allow this court to reverse the trial court's finding.

### C. The Negligence of Classic Coach, Inc. and Albert Rush, Sr.

¶24. Although Larry was found to be negligent by failing to yield the right of way, Rush also had certain duties as a driver. This Court has held a jury question is raised as to whether a driver who notices a car approaching an intersection at approximately the same speed and distance is negligent in not applying brakes before the collision. *Jobron v. Whatley*, 250 Miss. 792, 168 So. 2d 279, 282 (1964). In *Jobron*, Whatley, the driver of one car, claimed she did not see the car approaching the intersection until her attention was called to it by one of the passengers. *Id*. at 283. Once she became aware of the car, she failed to continue to keep a proper lookout, and she also failed to keep her vehicle under proper control by not reducing her speed as she approached the intersection. *Id*. at 280.

> The record shows that she saw the vehicle in time to take precautionary measures, by slowing the car down, by blowing the horn, or by turning the vehicle to the right or left, so that when Dr. White did not reduce his speed, or did not stop for the stop sign, she could still be able to avoid the collision of the two automobiles.

*Id*. at 283.

¶25. Whatley assumed she had the right of way and she assumed the other driver would stop at the posted stop sign. *Id*. From these assumptions, this Court held it was proper for the fact finder to infer there was no proper lookout. *Id*. at 284. The right to assume the other driver will obey the law exists only until one knows or by exercising reasonable care should know otherwise. *Id*. The assumption ceases when the driver should have seen the other car was not going to stop. *Id*. This Court found Whatley abused her right to assume by not keeping her car under proper control and by not keeping a proper lookout. *Id*.

¶26. In the case sub judice, as he approached the intersection, Rush took his foot off the accelerator and placed it over the brake but did not apply the brakes until he was two feet from impact. He testified that his speed had slowed to approximately 40 miles per hour, but Officer Richardson's report indicates he was traveling at approximately 50-55 miles per hour. There is no mention in the record that Rush made any attempt to sound his horn to warn the oncoming car when he realized Larry was not going to stop at the stop sign. In his deposition, Rush testified that he swerved to the left attempting to avoid hitting the car, but at trial he stated the bus swerved on impact and he did not actively turn the bus. Rush stated he had been taught in training that a bus was more likely to turn over if one tried to turn it. Rush breached his duties as a driver when he failed to keep a proper lookout and when he failed to keep the bus under his control. Rush even admitted that he was ninety percent sure that had he known Larry was not going to stop at the stop sign, in other words had he been keeping a proper lookout, he could have avoided the accident.

¶27. According to Miss. Code Ann. § 63-3-505 (1996), the driver of a passenger bus must reduce his speed to 45 miles per hour "during inclement weather when visibility is bad." Rush testified it had been raining while he was inside the casino, but it had stopped by the time he left for his second trip to Memphis. He stated he did not use his windshield wipers and his visibility was clear. A veteran highway patrolman, of six years, testified weather was not inclement at the time he reached the scene fifteen minutes after the accident. He stated he had to travel from several miles away at high speeds but had no problems maintaining control of his vehicle. He also testified that he did not use his windshield wipers, nor did he need to take shelter in his car from bad weather. He did testify that the roads were wet but indicated on his report that they were not slick.

¶28. The only eyewitnesses who testified at trial from the passenger bus besides Rush were two gentlemen seated at the back of the bus. The two gentlemen admitted to being passed out from a night of drinking and gambling at the casino. The two witnesses were made aware of the accident when one hit his head on the seat in front of him and the other fell to the floor after the impact of the crash. Each man stated after they exited the bus the weather was bad, possibly sleeting. One man stated the windshield wipers of the bus might have been on. He did not really look, but he just assumed they were on. No other passenger from the bus was called to testify.

¶29. Miss. Code Ann. § 63-3-505 (1996), states a driver must also decrease his speed when approaching an intersection or when a *special hazard* exists. Although Rush testified that he did not notice the stop sign had been knocked down even though he had traveled through this intersection three times since the December 11 accident, Rush was still aware of the dangerous propensity of the intersection. Rush had been warned by co-workers of this specific intersection. This intersection which was known to be dangerous created a special hazard which should have caused Rush to decrease his speed. Rush testified that he paid more attention to the cars than he did the signs. If he had been keeping a proper lookout at this intersection, that was known to be dangerous, it is likely that this accident could have been avoided.

¶30. At trial Rush testified that he did not have a clear view of the traffic traveling east on Highway 304 because a service station was obstructing his view causing him to continuously glance to his left to check for oncoming traffic. He did not mention this service station in his deposition and aerial photographs clearly show that the service station did not obstruct his line of sight. Rush was aware of Larry's car but chose to not to keep a proper lookout as it neared the dangerous intersection.

¶31. Due to several discrepancies in Rush's testimony, the trial judge found the testimony of the two disinterested passengers from the bus and the veteran patrolman more credible than the testimony of Rush and allocated fault in the amount of 54% to Classic Coach.

¶32. Based on the evidence above, the trial court did not abuse his discretion in allocating fault in the amount of 54% to Classic Coach. By not keeping a proper lookout and by not keeping his bus under proper control by maintaining a safe speed which was required by law, Rush was negligent in his duties as a driver. He knew of the dangerous intersection and he was aware of the approaching car, but he chose not to keep a proper lookout for Larry's car. As stated above, this Court may not overturn a trial judge's finding of fact unless it is shown that the trial court was manifestly wrong in its decision. This Court is unable to find any such wrongdoing by the trial judge and affirms the trial judge's allocation of fault of 54% to Classic Coach.

### II. Whether the Trial Judge Correctly Applied Miss. Code Ann. § 85-5-7 (1999) When Apportioning Liability to Each Tortfeasor.

¶33. Statutory interpretation is a question of law which this Court reviews de novo. *Donald v. Amoco Prod. Co.*, 735 So.2d 161, 165 (Miss.1999). Therefore, this Court is not required to defer to the judgment or ruling of the trial judge. *DePriest*, 798 So. 2d at 458.

¶34. Classic Coach contends the trial judge erroneously applied Mississippi's apportionment statute, Miss. Code Ann. § 85-5-7 (1999), when the judge entered two separate judgments, one of which held Classic Coach joint and severally liable for one-half of the Johnsons' and McBrides' recoverable damages. Classic Coach argues if this Court affirms the trial judge's allocation of fault, at most Classic Coach should be held responsible for paying their direct proportion of liability, or 54% of the Johnsons' and McBrides' total damages and should not be held joint and severally liable for any of the Johnsons' and McBrides' damages.

¶35. The issue before this Court involves the proper interpretation and application of a statute.

> The primary rule of construction is to ascertain the intent of the legislature from the statute as a whole and from the language used therein. Where the statute is plain and unambiguous there is no room for construction, but where it is ambiguous the court, in determining the legislative intent, may look not only to the language used but also to its historical background, its subject matter, and the purposes and objects to be accomplished.

*Clark v. State ex rel. Miss. State Med. Ass'n*, 381 So.2d 1046, 1048 (Miss.1980). Instead of trying to determine whether the holding of the trial judge was appropriate, this Court should look to the statute's language as guide in determining the proper outcome according to the correct application of the statute. *DePriest*, 798 So. 2d at 458. The statute at issue is Miss. Code Ann. § 85-5-7 (1999) which reads in part as follows:

> ...(2) Except as may be otherwise provided in subsection (6) of this section, in any civil action based

on fault, the liability for damages caused by two (2) or more persons shall be joint and several only to the extent necessary for the person suffering injury, death or loss to recover fifty percent (50%) of his recoverable damages.

(3) Except as otherwise provided in subsections (2) and (6) of this section, in any civil action based on fault, the liability for damages caused by two (2) or more persons shall be several only and not joint and several and a joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault. In assessing percentages of fault an employer and the employer's employee or a principal and the principal's agent shall be considered as one (1) defendant when the liability of such employer or principal has been caused by the wrongful or negligent act or omission of the employee or agent....

¶36. Miss. Code Ann. § 85-5-7 (1999), enacted by the Legislature on July 1, 1989, abolished joint and several liability over 50%, and as a compromise, kept joint and several liability only to the extent necessary to ensure the injured party would receive 50% of the recoverable damages. *Narkeeta Timber Co. v. Jenkins*, 777 So. 2d 39, 42 (Miss. 2000). "Thus, the statute serves to reduce the extent to which one defendant could be held liable for the negligence of another." *Estate of Hunter v. Gen. Motors Corp.*, 729 So. 2d 1264, 1274 (Miss. 1999). This Court has held that when a defendant's share of fault is less than 50%, under Miss. Code Ann. § 85-5-7(2), that defendant will be required to pay 50% of the recoverable damages. *Narkeeta*, 777 So. 2d at 42. Furthermore, this Court should go on to conclude under the express language of the statute, if a defendant's share of fault is greater than 50%, the defendant "shall be liable only for the damages allocated to him in direct proportion to his percentage of fault." Miss. Code Ann. § 85-5-7(3) (1999).

¶37. In the case sub judice, the trial judge entered two separate judgments. He first found each defendant to be joint and severally liable for one-half of the Johnsons' and McBrides' recoverable damages. This meant Classic Coach would be responsible for the payment of $1,170,000.00 to the McBrides and would be responsible for the payment of $900,000.00 to the Johnsons. Secondly, the trial judge applied each Classic Coach's, Rush's and MDOT's percentage of fault to the remaining 50% of the recoverable damages to determine the apportioned judgment. In the second judgment, the judge ordered Classic Coach to pay 60% of the Johnsons' and McBrides' remaining recoverable damages which would equal $702,000.00 for the McBrides and $540,000.00) for the Johnsons. Classic Coach's total payment to the McBrides, according to the judgment rendered by the trial judge, was $1,872,000.00 which equaled 72% of their total damages. Classic Coach's total judgment for the Johnsons was $1,440,000.00 which also equaled 72% of their total damages.

¶38. By referring to Classic Coach's percentage of fault as sixty percent of recoverable damages, the judge confuses the meanings of subsections 85-5-7(2) and 85-5-7(3). Subsection 85-5-7(3) strictly deals with total damages, therefore, the trial judge should have referred to Classic Coach's percentage of fault as 54% of total damages. Because Classic Coach was found to be 54% liable for the Johnsons' and McBrides' total damages, subsection 85-5-7(2) should never have been applied. Joint and several liability is to be used only to ensure the injured party will recover one-half of his recoverable damages. Because Classic Coach was found to have a fault greater than 50%, Classic Coach by law must pay the amount of damages directly proportionate to its allocation of fault. The Johnsons and McBrides need no protection to ensure they will recover one half of the recoverable damages because Classic Coach, under Miss. Code Ann. § 85-5-7(3) (1999), will pay 54% of the total damages.

¶39. There is no reversible error in the calculation of total damages, as discussed below, but the trial judge did err in his interpretation of Miss. Code Ann. § 85-5-7 (1999). If this court finds that the trial judge committed no manifest error in his findings of fact, Miss. Code Ann. § 85-5-7(3) (1999) shall apply. Classic Coach was found to be 54% at fault, and because Classic Coach's liability is greater than 50%, Classic Coach shall pay, and shall only pay, its apportioned share of the total damages to the Johnsons and McBrides as provided in Miss. Code Ann. § 85-5-7(3) (1999).

### III. Whether the Total Damages Awarded to Each Plaintiff Were So Grossly Excessive as to Go Against the Substantial Credible Evidence of the Trial.

¶40. Classic Coach's final argument is the wrongful death awards granted by the trial judge were so grossly excessive that they should be considered outrageous and thus reduced. Classic Coach argues the trial judge erroneously relied on expert testimony regarding the national average used to determine future lost income, expert testimony regarding the correct consumption rate to be applied to each decedent and eyewitness testimony claiming Matthew was alive for a period of time after the accident and experienced conscious pain and suffering. Weighing all these factors, Classic Coach argues the total damages rendered by the trial judge were extremely excessive such that it should shock the conscience of this Court. Classic Coach asks that these total damage awards be reduced to an amount which compares to past Mississippi wrongful death awards.

¶41. Larry was twenty-one, newly married, and a father of an infant son when he was killed. He had worked at Waffle House for several years, and he also played in a band. He was pursuing a major in biochemistry at the University of Central Arkansas and had recently been asked by his professors to join the Honors College. The total wrongful death damages awarded to the McBrides were $2,600,000.00. The court awarded the McBrides $958,472 in present economic value of income lost leaving $1,641, 528.00 for other wrongful death damages.

¶42. Matthew was survived by his parents and three sisters. He had recently left the University of Central Arkansas to earn money to finance his education. He had bought property which he intended to fix up and sell as rental property. The total wrongful death damages awarded to the Johnsons were $2,000,000.00. The court awarded the Johnsons $947,508 in present economic value of income lost leaving $1,052, 492.00 for other wrongful death damages.

¶43. C. David Channell, an expert in the field of economics, performed three analyses depending upon the level of education each decedent would have attained in order to complete his economic impact study to determine each decedent's earning capacity. The three approaches were based on minimum wage, average wage for a high school graduate and average wage for a college graduate. Channell testified the average wage for a college graduate was the most appropriate approach because there was no doubt both decedents would graduate from college. Channell used an average starting salary of $44,307.00, which he obtained from the 1997 Bureau of Census Table 9, for each decedent. The only difference in computation between Larry and Matthew was the year of graduation. Channell testified that Matthew would graduate one year later than Larry because he had chosen to sit out a semester, therefore, his work-life expectancy would be one year less.

¶44. In a recent case, this Court set out the rebuttable presumption rule for the awarding of damages when the base income is unknown. *Greyhound Lines, Inc. v. Sutton*, 765 So. 2d 1269, 1277 (Miss. 2000).

Therefore, we hold that in cases brought for the wrongful death of a child where there is no past income upon which to base a calculation of projected future income, there is a rebuttable presumption that the deceased child's income would have been the equivalent of the national average as set forth by the United States Department of Labor. This presumption will give both parties in civil actions a reasonable benchmark to follow in assessing damages. Either party may rebut the presumption by presenting relevant credible evidence to the finder of fact. Such evidence might include, but is certainly not limited to, testimony regarding the child's age, life expectancy, precocity, mental and physical health, intellectual development, and relevant family circumstances. This evidence will allow the litigants to tailor their proof to the aptitudes and talents of the individual's life being measured. We find this standard to be equitable for all the parties because it allows the fact finder to take into account the unique circumstances of each individual person in accordance with current Mississippi case law.

*Id*.

¶45. In the case sub judice, the Johnsons' and McBrides' expert gave three possible averages, minimum wage, high school graduate and college graduate from which the court could analyze the future lost income. As the rule states in *Greyhound Lines*, the presumption is rebuttable. The only testimony offered by the defense to rebut the presumption was the decedents were not college graduates, therefore, the average used should not be that of a college graduate. The defense chose only to point out that both decedents had maintained steady employment at Waffle House and Wal-Mart while attending school. Larry was presently enrolled in school with the intentions of entering the Honors College at the request of his professors. Matthew had recently decided to sit out a semester to earn money to pay for his education by restoring rental property. After reviewing all the evidence the trial judge agreed with the expert that the college graduate average was the best average to use when calculating the future lost income of both decedents.

¶46. Classic Coach also questioned the Johnsons' and McBrides' expert's use of consumption rate with regards to Matthew. Channell used the same 30% personal maintenance expenditure percentage for each decedent even though Larry was married with a child and Matthew was not married, did not have a dependent but may have had a roommate. Channell testified that he used Earl Cheit's report which is based on families of two or more for Matthew as well as Larry because he believed Matthew had a roommate. Channell also stated he did not agree with the reports used by the defense showing a personal maintenance expenditure percentage calculated for a single person at 67% because the reports included expenses which were otherwise not living expenses and did not take into account other adjustments which should be made.

¶47. In *Greyhound Lines*, this Court also looked at the question of the use personal maintenance expenditure percentage, or consumption rate as it was called, when computing the future lost income. The consumption rate was held to be "another factor which may be argued by the parties to the finder of fact in support of increasing or decreasing the presumption that the deceased child's income would have been equivalent to the national average." *Greyhound Lines*, 765 So. 2d at 1279. This Court held it could be argued by both parties, and the credibility would be determined by the finder of fact. *Id*. In *Greyhound Lines*, Channell based his testimony on Earl Cheit's study and used a personal maintenance allowance of 30% for the deceased children. *Id*. The chancellor agreed with his findings and he rendered his verdict accordingly. *Id*. The chancellor's verdict as to damage awards for the deaths of the children, which was erroneously reversed by the Court of Appeals, was reinstated by this Court. *Id*.

¶48. Classic Coach argues even if this Court finds the future lost income awards rendered by the trial judge

are supported by the evidence, the remaining wrongful death awards should shock the conscious of this court. Classic Coach illustrates by Mississippi case law the precedent this Court has followed in awarding wrongful death damages in cases such as the case sub judice. The most recent case cited was in 1974. This Court has expressed its disapproval for using such outdated cases when it stated, "It is true that just a few years ago a judgment for half the size of these verdicts would have been considered excessive, but that was before 5 cents magazines sold for 50 cents and $25 suits sold for $100." *Kinnard v. Martin*, 223 So. 2d 300, 302 (Miss. 1969). This Court has also described the great difficulty a court is often faced when deciding the excessiveness of a verdict.

> Dealing with the amount of verdicts is one of the most troublesome questions with which the courts have to struggle. There is no exact yardstick, or measurement, by which to test the question. Each case must depend upon its own facts. The test is not what amount the members of the court would have awarded had they been upon the jury, or what they, as an appellate court, think should have been awarded, but whether the verdict is so excessive as to indicate that the jury was animated by passion, prejudice, or corruption. We think the verdict was large, but considering all the circumstances, including the age of the plaintiff, we are not able to say the amount of the verdict was the result of passion, prejudice or corruption.

*Peerless Supply Co. v. Jeter*, 218 Miss. 61, 65 So. 2d 240, 243 (1953).

¶49. In addressing Matthew's pain and suffering, the trial judge stated in his findings of fact that he did not allocate any certain monetary amount for pain and suffering. He only considered it along with the other wrongful death elements when he determined the total damages award. Two eyewitnesses from the scene testified. When asked if either of the passengers' physical condition could be determined, Curtis Boyd (Boyd), an eyewitness from the bus, testified he could tell the driver died instantly but the passenger was "still alive, trying to exit the vehicle slowly but was seriously hurt." Boyd stated he was approximately 10 to 15 feet from the car when he observed Matthew. Another eyewitness from the bus, Ronald Flowers (Flowers), testified he heard Matthew moaning and saw him moving in the car. He stated that he was approximately five to seven feet from the car and the area was well lit. Flowers did state that he was not aware if Matthew was conscious of his surroundings. At trial Officer Richardson stated Matthew had been removed from the car by the paramedics who informed him that Matthew had not survived the accident. Officer Richardson also stated that he interviewed people at the scene, but no one made any statement to him indicating that either one of the passengers in the car had survived the accident.

¶50. There is substantial evidence to support the amount of damages awarded by the trial judge. Recent cases have left future lost earnings and personal maintenance expenditure percentages as questions of fact for the fact finder. There has been no abuse of discretion in the awards rendered by the trial judge to the families of these two very young men with such possibility for the future.

## CONCLUSION

¶51. The trial court did not abuse his discretion, was not manifestly wrong or clearly erroneous and did not apply an erroneous legal standard when he determined the allocation of fault for each of the parties. Although Larry's allocation of fault is extremely low, when viewed in light of all facts presented, the trial court was able, by the evidence presented, to allocate fault in the manner he decided. As ultimate fact finder, his findings should not be overturned unless this Court feels he has abused his discretion or is manifestly wrong or clearly erroneous. This standard is clearly not met in this particular case. There is

substantial evidence on the record to support the damage awards rendered by the trial court. Therefore, the issues of liability and damages should be affirmed.

¶52. The trial court erred when he applied Miss. Code Ann. § 85-5-7 (1999). Miss. Code Ann. §§ 85-5-7(2) and 85-5-7 (3) were not meant to be used in conjunction to expand joint and several liability. Classic Coach was found 54% liable and is thus responsible under Miss. Code Ann. § 85-5-7(3) (1999) for 54% of the Johnsons' and McBrides' total damages. The case is remanded to render judgment ordering Classic Coach to pay the McBrides 54% of the total damages in the amount of $1,404,000.00 and the Johnsons 54% of the total damages in the amount of $1,080,000.00.

¶53. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

> **PITTMAN, C.J., McRAE, P.J., DIAZ AND GRAVES, JJ., CONCUR. SMITH, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WALLER AND COBB, JJ. COBB, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY SMITH, P.J.; WALLER, J. JOINS IN PART. CARLSON, J., NOT PARTICIPATING.**

> **SMITH, PRESIDING JUSTICE, DISSENTING:**

¶54. Common sense dictates that a driver who has ingested amphetamines and then speeds up to go through an intersection despite numerous obvious signs of that intersection and a "stop ahead" sign should carry more than 10% of the liability for any accident which then occurs. As I find that the majority disregards governing laws, fair play and any notions of common sense by affirming the trial court, I respectfully dissent.

¶55. McBride was driving west on State Highway 304. He had ingested methamphetamines within the last six to twelve hours. The drug was still in his bloodstream. As he approached U.S. Highway 61, he passed by numerous indicators that he was approaching a major intersection. He passed a "stop ahead" sign and an intersection sign. The line in the middle of the road began to indicate no passing. There was a traffic island that also had a large intersection sign on it and a white stop bar on the road prior to reaching the intersection. Evidence was presented that McBride was not very familiar with this particular road, however, rather than exonerating him from any liability, his unfamiliarity with the roads should actually have made him more cautious. It is clear that part of the ordinary care that drivers are charged with should include reading signs along the roadway. *See generally **Cent. Paving & Constr. Co. v. McCaskin**,* 183 Miss. 814, 184 So. 464 (1938); ***McClendon v. Boyd Constr. Co.**,* 224 Miss 365, 80 So. 2d 32 (1955).

¶56. The trial court cited to Miss. Code Ann. § 63-3-801 for the proposition that "[t]he absence of a stop sign places a statutory duty on Defendant Rush to yield the right of way to a vehicle entering an intersection from the right at approximately the same time, and to yield the right of way to a vehicle which had already entered the intersection." This would ridiculously place a burden on Rush to have known of the absence of the stop sign. The Georgia Court of Appeals faced a similar question in an appeal from a directed verdict in favor of a defendant. I find the logic demonstrated in this opinion applicable to the case at bar. As the Georgia Court of Appeals noted:

> [M]otorists coming upon an intersection with a missing stop sign would not necessarily appreciate that fact. Here the evidence was that travelers along Middleground Road had always had the right of way. In order to hold that a fact question exists as to who had the right of way at the intersection, we would

in effect be saying that travelers on Middleground Road should somehow discern that the stop sign controlling traffic *on the intersecting road* was suddenly missing, and that they were entering an uncontrolled intersection. And although the travelers on Middleground Road did not have any clue that the stop sign was missing, there was a "stop ahead" sign on Mallard Pond Road, which Brown and other travelers passed before coming to the intersection. To let a jury decide if Hines was negligent in proceeding through the intersection under these circumstances simply defies logic and reason. What happened here was tragic, but that does not mean it was the result of negligence or that either driver was at fault. The trial court did not err in granting summary judgment in this case.

*Brown v. Hines*, 495 S.E.2d 592, 594 (Ga. Ct. App. 1998). Similarly, it defies logic and reason for Rush and Classic Coach to be held liable, even more so when one considers that they have been held to be primarily responsible for this accident.

¶57. The trial court also consistently refered to the fact that it was raining and sleeting, visibility was poor, and the roads were wet and slick. Its determination that it was raining and sleeting rests on very shaky ground. The only two witnesses to testify that it was raining and sleeting were two passengers on the bus. These two passengers admitted to being too intoxicated to have driven themselves and noted that they were asleep at the back of the bus when the accident occurred. To the contrary, Rush and investigating officer Richardson testified that the roads were wet, but not slick, and that it was not raining or sleeting. This Court has noted that "[t]he fact that a witness was intoxicated at the time of the events concerning which he testifies bears upon his capacity for accurate observation and correct memory and hence is proper to be shown in passing on his credibility." *Byrd v. State*, 154 Miss. 742, 123 So. 867, 869 (1929) (citations omitted). This principle certainly does not require the fact finder to disregard the testimony of an intoxicated witness. However, it does suggest that such intoxication affects the capacity for observation and this is even more so when there are witnesses testifying differently. The trial judge concluded that visibility was poor from perusing the photographs of the area taken by the police on that evening. This conclusion is in direct contradiction of the testimony by Officer Rush, and the accident report. The trial judge then built on his determination that visibility was poor by finding that Rush violated Miss. Code Ann. § 63-3-505, which states in pertinent part that when entering an intersection or other areas where more caution is called for "[a]ll...passenger buses shall be required to reduce speed to forty-five miles per hour during inclement weather when visibility is bad." Rush testified at trial that he was probably going about 40 to 45 miles per hour once he entered the intersection. He had reportedly told the investigating officer that he had been traveling at 50 to 55 miles per hour. Rush explained that he had been traveling at that speed, however he had taken his foot off the accelerator upon approaching the intersection and seeing McBride's vehicle approach, and thus he was going approximately 40 to 45 miles per hour upon entering the intersection. Nevertheless, the trial judge deduced that visibility was poor and that Rush never decreased his speed below 50 to 55 miles per hour.

¶58. The trial judge found that the proof at trial was insufficient to support a finding that McBride's actions and ability to drive were affected by the drugs identified in the lab results. He further noted that at least one expert testified that the effects of marijuana and methamphetamines could be offset by each other. Following these observations, the trial judge decided to entirely disregard any testimony regarding McBride's use of drugs. This was absolutely error. First, both plaintiffs' and defendants' experts testified that any drug found in someone's system will have an effect. Plaintiffs' expert noted that this would not necessarily be a significant effect so as to cause negligent driving. I would find that "impaired" means "impaired." Miss. Code Ann. § 63-11-30 (1)(d) states that "[i]t is unlawful for any person to drive or

otherwise operate a vehicle within this state who...is under the influence of any drug or controlled substance, the possession of which is unlawful under the Mississippi Controlled Substances Law..." Methamphetamines are an unlawful controlled substance. It is uncontradicted that McBride was under the influence of this drug at the time of the accident. Further, the law in this state is that "[v]iolations of statutes generally constitute negligence per se." **Thomas v. McDonald**, 667 So. 2d 594, 596 (Miss. 1995). **Thomas** further notes that

> The principle that violation of a statute constitutes negligence per se is so elementary that it does not require citation of authority. When a statute is violated, the injured party is entitled to an instruction that the party violating is guilty of negligence, and if that negligence proximately caused or contributed to the injury, then the injured party is entitled to recover.

**Id**. (citing **Bryant v. Alpha Entertainment Corp.**, 508 So. 2d 1094, 1096 (Miss. 1987)). While it was not imperative that the trial judge find McBride totally negligent due to the evidence of his violation of § 63-11-30 (1)(d), it was certainly error for him to disregard this evidence entirely.

¶59. The Louisiana Court of Appeals dealt with a similar situation as the one presented in the case sub judice in **Naquin v. St. John the Baptist Police Jury**, 562 So. 2d 934 (La. Ct. App. 1990). In **Naquin**, a motorist filed suit against the state for injuries incurred in a collision occurring at the intersection of two state highways. **Id**. at 935. The stop sign for the subordinate roadway was down, and plaintiff continued through the intersection colliding with a motorist traveling on the favored thoroughfare. **Id**. The court first noted that:

> The duty of a motorist who approaches an uncontrolled intersection with a street of equal dignity is to determine that he can make the crossing safely before proceeding into the intersection. Furthermore, a motorist approaching an intersection who actually does not have the right-of-way but who was led to believe the intersection is uncontrolled cannot reasonably be said to have been trapped or deluded into the belief that he had an unqualified right-of-way.

**Id**. (citation omitted). The court found that it agreed with the trial court that the missing stop sign could not have caused the plaintiff to assume that she had the right-of-way. In doing so, the court noted that the plaintiff had admitted she saw a "stop ahead" sign and that there was a "cross-street." **Id.** at 936. The court further noted that there was a road sign indicating the highway junction prior to the intersection, and that the backside of the stop sign controlling the traffic on the opposite side of the intersection was visible. **Id**. Ultimately, the court held that the plaintiff "had a duty to keep a proper lookout as she entered the uncontrolled intersection." **Id**. The same may be said in the case at bar for McBride. His lights dipped as he entered the intersection, thus he was slowing down. While no one can ascertain what he was thinking during that time, it can certainly be said that he had a duty as he slowed to make himself aware of this road that he seldom traveled and to keep a proper lookout.

¶60. The Supreme Court of South Carolina asserted some general principles concerning cases regarding "downed stop signs" in **Powell v. Simons**, 188 S.E.2d 386 (S.C. 1972), that I find persuasive:

> 1. Once a through street or arterial highway has been properly designated and appropriate signs have been erected, the preferred status of the highway is not lost merely because a stop sign is misplaced, improperly removed, destroyed or obliterated.

2. A motorist on a preferred highway is entitled to assume that a vehicle approaching on a secondary highway will stop for the intersection, unless he has knowledge of the absence of the sign, or he is otherwise put on notice that the vehicle on the intersecting street is not going to stop.

3. A motorist on a secondary highway is required to stop if he has knowledge of the nature of the preferred highway, even though the sign is absent.

4. A motorist on a secondary highway is not required to stop in the temporary absence of a stop sign, if he does not have knowledge of the character of the preferred highway, but may still be liable if he is otherwise negligent.

*Id.* at 389 (citation omitted). Here, however, the trial court found the exact opposite of the first principle, in that he stated Highway 61 lost its favored status. This is ridiculous that the loss of a stop sign unbeknownst to those traveling Highway 61 can cause a highway to lose its status. As to the second principle, the evidence at trial supports that Rush was unaware until the last minute that McBride was not going to stop. Under the third and fourth principles, McBride may not have been aware of the status of the preferred highway, but he was certainly on notice as to the intersection coming up. While *Powell* found that a "stop ahead" sign located 700 to 800 feet prior to the intersection imposed no knowledge on the plaintiff, in the case sub judice there is much more than a single "stop ahead" sign. As previously illustrated, there were numerous warnings concerning this intersection. In addition, McBride was otherwise negligent due to his ingestion of methamphetamines.

¶61. It absolutely boggles the mind that Classic Coach and Rush were held predominantly responsible for this accident. The evidence of methamphetamines in McBride's blood should not have been disregarded completely. Further, the fact that there was a stop ahead sign, and numerous other markers that this was a major intersection, should have put McBride on alert to at least watch closely for traffic on Highway 61. This is much more true for McBride than it is for Rush, the bus driver. Yet, the majority holds Rush to a very high standard, while he clearly had the right of way at the intersection. Further, the MDOT should have more responsibility for this accident than they have been given. Leaving a known dangerous intersection without a stop sign for more than t hirty hours is highly irresponsible. In my opinion, the trial judge and the majority merely allow plaintiffs to hold the deep pocket accountable for the actions of the two predominately negligent parties, McBride and MDOT. Thus, I dissent.

**WALLER AND COBB, JJ., JOIN THIS OPINION.**

**COBB, JUSTICE, DISSENTING:**

¶62. Despite the evidence that the driver, Larry McBride, was affected by methamphetamine and marijuana at the time of this tragic accident, the trial court, sitting as finder of fact, erroneously disregarded this information. It also mistakenly concluded that no evidence existed from which it could possibly infer negligence on the part of the passenger, Matthew Johnson. Because of this reversible error, I respectfully dissent.

¶63. The majority states that two experts both "agreed that the methamphetamine most likely had some effect on McBride since it was found in his blood." Nevertheless, the trial court excluded from its deliberation any evidence on the drugs found in McBride's blood and urine samples because the state crime lab destroyed those samples before it could determine the precise quantities of the drugs in those samples.

¶64. This Court has stated that

> It is a fact capable of judicial notice that consumption of even small quantities of alcohol may significantly, albeit "imperceptibly," impair reaction time. Where split seconds are critical, even a very slight impairment of reaction time may spell the difference between accident or no accident, between proximately contributing negligence or the lack of it.

*Allen v. Blanks*, 384 So. 2d 63, 67 (Miss. 1980). At issue in *Allen* was a jury instruction to find the defendant negligent per se if she had driven under the influence of alcohol. *Id.* at 65-66. We considered that

> the only consequence of giving the instruction is to call the jury's attention to the relevant evidence as to whether the driver was intoxicated and further as to whether the intoxication, if any, proximately contributed to the accident. An instruction of the kind offered by [the plaintiff] **does not, as [the defendant] suggests, bind the jury to a finding of negligence**. It simply indicates the legal effect of findings of intoxication and proximate cause, **leaving entirely to the jury the factual question of whether such intoxication and proximate cause appears from the evidence presented**.

*Id.* at 67 (emphasis added). There was no evidence of blood-alcohol level in the record (a breath test having been excluded on statutory grounds), but evidence was offered that a half-empty gallon jug of wine was in the defendant's car and that officers at the accident scene detected the scent of alcohol hanging about the defendant. *Id.* at 64. We concluded that exclusion of the instruction was reversible error, and that the questions of whether or not the defendant was intoxicated and whether or not that intoxication was a proximate cause of the accident were within the jury's province. *Id.* at 68.

¶65. *Allen* was followed by this Court in, among other cases, *Mills v. Nichols*, 467 So. 2d 924, 929 (Miss. 1985) where we held that "the plaintiff's own admission that he had consumed several beers in the hours preceding the accident formed a sufficient evidentiary basis for submitting the question to the jury in this case, notwithstanding the absence of alcohol on his breath, and liquor bottles in his car." This case is even more pertinent than *Allen*, since mere evidence of consuming the intoxicant some hours before the accident was sufficient to create a jury question.

¶66. It is unclear how the majority can mention *Allen* and yet uphold the trial court's ruling in the present case. The majority correctly states that, in *Allen*, we held "that consumption of even a small quantity of alcohol or drugs[1] *may* significantly impair reaction time." Maj. op. ¶ at 21 (emphasis in original). Yet the majority goes on to state that "the trial judge was presented with the evidence, and finding that no testimony **directly indicated** that McBride was, in fact, under the influence of the drug, **disregarded** all such testimony." *Id.* (emphasis added). The evidence of drug use was actually much stronger here than the evidence of alcohol use in *Allen*, and leads to the conclusion that the trial court followed an incorrect legal standard in deciding whether to consider the evidence before it.

¶67. For the finder of fact to impose such an incorrect legal standard on the conclusions which may be drawn from the evidence is reversible error. *See Schmitt v. State*, 560 So. 2d 148, 151 (Miss. 1990) (this Court "gives no deference to findings of the trial court, if the trial court applied the wrong legal standard in reaching its decision"); *Leatherwood v. State*, 539 So. 2d 1378, 1387 (Miss. 1989) ("[f]actfindings made under an erroneous legal standard are not protected by our substantial evidence clearly erroneous standard of review"). *Allen* and *Mills* are explicit in holding that the finder of fact need not have expert testimony on the exact quantity and effect of the intoxicant to a medical certainty.[2] Therefore the trial court should not

have flatly ignored the evidence because it lacked "specific medical testimony" in the form of an "exact quantitative amount." No such amount is required for a jury, or a judge sitting as trier of fact, to find that a person was intoxicated and that the intoxication was a proximate cause.

¶68. Of course, the finder of fact is entitled to evaluate the evidence and conclude that it does not rise to the level of a preponderance favoring intoxication or proximate cause. I do not, however, believe it is proper for the court as finder of fact to "disregard" the evidence altogether. This is not a merely verbal distinction. There is a great difference between weighing the evidence and finding it wanting, versus choosing not even to regard or consider the evidence. "Disregard" is a term of art in this context. *See, e.g., **Jones v. Wiese***, 652 So. 2d 175, 178 (Miss. 1995) (jury instruction stated that the "court instructs the jury that any evidence which tends only to show a possibility **is no evidence at all and must be disregarded** by you in reaching your verdict") (emphasis added); *cf.* Black's Law Dictionary 472 (6th ed. 1990) ("to leave out of consideration; to ignore"). It is reversible error for the trial court to instruct the jury to disregard evidence which it should have been allowed to consider. ***Clark v. State***, 514 So. 2d 1221, 1224 (Miss. 1987). There is no reason why it should not likewise be reversible error for the trial court sitting as finder of fact to, in effect, instruct itself to disregard evidence which should have been considered under the correct legal standard.

¶69. I also find error in the trial court's determination that no evidence existed to show that Matthew Johnson, the passenger, could be inferred to have known that McBride had been taking drugs. Our case law recognizes that a finder of fact may assess passengers with some degree of fault when they ride with someone whom they reasonably should know to be under the influence of intoxicating substances. *Miss. Power & Light v. Lumpkin*, 725 So. 2d 721, 732 (Miss. 1998). The assertion that the trial court had no evidence to infer McBride's being under the influence of drugs has already been refuted. Further, a contradiction arises between the majority's stated reasons for agreeing that the trial court properly excluded any consideration of Johnson's percentage of fault. The majority first states that there was no evidence that McBride and Johnson had taken drugs together (notwithstanding the fact that Johnson's own post-mortem drug test revealed evidence of amphetamines, methamphetamine, and marijuana, the same drugs that were in McBride's system). The majority then states that Johnson's drug test was irrelevant to any negligence finding, because he was a mere passenger. Given the circumstance that the two men had "spent the evening in Memphis looking for prospective employment," the trial court should have recognized how unlikely it would be that the two men, unbeknownst to each other, had coincidentally ingested the same drugs over the course of a long evening of job hunting.[3]

¶70. I would reverse and remand for a new allocation of fault in which the finder of fact weighs the evidence of drugs in McBride's system and considers whether Johnson should be assessed a percentage of fault for his own negligence in riding with McBride.

### SMITH, P.J., JOINS THIS OPINION. WALLER, J., JOINS THIS OPINION IN PART.

1. Although *Allen* does not specifically mention "drugs," the majority is correct to infer that what applies to alcohol should *a fortiori* apply to other drugs.

2. It would be up to the finder of fact to evaluate the expert's opinion that "the effects of one could have cancelled out the effects of the other." (Does that mean that one can escape the ill effects of drug use, if only one takes *enough countervailing drugs*?)

3. The finder of fact's conclusions are further called into question by observing that December 13, 1993, was a Monday; thus the accident occurred at 3 a.m. on a Monday morning after a Sunday night allegedly spent looking for gainful employment in Memphis.